JINA L. CHOI (NY Bar No. 2699718)
ERIN E. SCHNEIDER (Cal. Bar No. 216114)
 schneidere@sec.gov
JASON M. HABERMEYER (Cal. Bar No. 226607)
 habermeyerj@sec.gov
ANDREW J. HEFTY (Cal. Bar No. 220450)
 heftya@sec.gov
RUTH L. HAWLEY (Cal. Bar No. 253112)
 hawleyr@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 705-2500

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| JSG CAPITAL INVESTMENTS, LLC, JSG CAPITAL, LLC, JSG CAPITAL LLC, JSG ENTERPRISES, LLC, JASWANT S. GILL, AND JAVIER RIOS, | |
| Defendants, | |
| JSG MANAGEMENT GROUP LLC, | |
| Relief Defendant. | |

Plaintiff Securities and Exchange Commission ("Commission") alleges:

**SUMMARY OF THE ACTION**

1.      The Commission brings this action to halt an ongoing fraudulent securities offering and Ponzi scheme perpetrated by defendants Jaswant S. Gill and Javier Rios through Gill's eponymous investment firm JSG Capital Investments, LLC ("JSG") and affiliated entities JSG Capital, LLC, JSG Capital LLC, and JSG Enterprises, LLC (collectively, the "JSG Entities").

2.      Since September 2013, Gill and Rios have fraudulently raised approximately $10 million from nearly 200 investors in the JSG Entities by promising guaranteed, fixed returns of up to 60 percent annually through purported investment in highly coveted, pre-initial public offering ("pre-IPO") shares of companies such as Airbnb, Alibaba, and Uber, and other investments in the stock market.

3.      Gill and Rios solicit middle-class investors with promises of "access to alternative investment strategies that were previously only available to the one-percenters."  In so doing, Gill and Rios falsely portray JSG as an authentic and prosperous investment firm, and lull investors into believing that their money is safe and secure.  For example, defendants claim that investor money is invested in the stock market, and JSG's website touts its "customized asset allocation strategy," actively-managed client portfolios "using a broad array of securities" and JSG's performance relative to well-known benchmarks.  JSG's investor contracts represent that the investments are secured by assets held at established brokerage firms, and that investors are additionally secured against losses by an insurance policy.  Gill has also touted his background as a Managing Director at Morgan Stanley and supposed "close ties" with well-known Silicon Valley venture capital firms that provided JSG access to shares in popular "pre-IPO" companies.

4.      In reality, JSG is a classic investment scam and Ponzi scheme.  Gill and Rios transferred less than 1 percent of investor funds to JSG Entity brokerage accounts, and no "pre-IPO" company shares were ever purchased.  The JSG Entities do not hold any accounts at one of the brokerage firms, are not a policyholder of the insurance policy they claim to be, and JSG's account at the other brokerage firm has never held more than $5,000.  Gill has never worked for Morgan

1  Stanley, and neither JSG nor Gill has any relationship with any of the Silicon Valley venture capital

2  firms touted on JSG's website.

3       5.    Instead, Gill and Rios have used millions in investor money to fund their lifestyle, and

4  to make Ponzi payments to earlier JSG investors.  Gill has received over a million dollars of investor

5  money in cash withdrawals, transfers to his personal bank account, the monthly rent at his personal

6  residence, and the use of an expense account to pay for excursions to high-end restaurants and clubs,

7  jaunts to Las Vegas casinos, gentlemen's clubs, professional sporting events, high-end hotels, and

8  luxury retail stores.  Rios has received at least $1.7 million from the scheme, and spent additional

9  investor money from a JSG-affiliated account to pay the monthly rent at his personal residence.  In

10 addition, Gill and Rios used over $500,000 in investor funds to pay for excursions to restaurants,

11 nightclubs, and luxury hotels, transportation including airfare and car service, and purchases at

12 retailers for furniture, clothing, and other accessories.  To further the scheme, Gill and Rios used

13 money from new investment into JSG to pay existing investors.  Since September 2013, defendants

14 have made approximately $4.2 million in Ponzi-like payments to JSG investors.

15      6.    The defendants continue to solicit new investors to join the scheme.  To halt their

16 fraud and protect current and future investors, the Commission seeks emergency *ex parte* relief in this

17 action to enjoin the defendants from continuing their unlawful conduct, freeze assets, and secure

18 other equitable relief.

19 **JURISDICTION AND VENUE**

20      7.    The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the

21 Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], Sections 21(d),

22 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d),

23 78u(e), and 78aa], and Sections 209(d) and 214 of the Investment Advisers Act of 1940 ("Advisers

24 Act") [15 U.S.C. §§ 80b-9(d), 80b-14].

25      8.    This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and

26 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)], Sections 21(d), 21(e) and 27

27

28

1  of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa], and Sections 209 and 214 of the

2  Advisers Act [15 U.S.C. §§80b-9 and 80b-14].

3          9.      Defendants, directly or indirectly, made use of the means and instrumentalities of

4  interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of

5  business alleged in this complaint.

6          10.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15

7  U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], and Section 214 of the

8  Advisers Act [15 U.S.C. § 80b-14].  During the period described in this complaint, JSG Capital

9  Investments and its affiliates, JSG Capital, LLC and JSG Capital LLC, purported to be a San

10 Francisco-based investment firm.  In addition, acts, transactions, practices, and courses of business

11 that form the basis for the violations alleged in this complaint occurred in this District.

12         11.     Under Civil Local Rule 3-2(d), this civil action should be assigned to the San

13 Francisco Division, because a substantial part of the events or omissions which give rise to the claims

14 alleged herein occurred in San Francisco.

15                                      **DEFENDANTS**

16         12.     **Jaswant S. Gill (aka Jason Gill)** of San Diego, California, is the founder and Chief

17 Executive Officer ("CEO") of JSG Capital Investments, LLC, JSG Capital, LLC, and JSG Capital

18 LLC.  His age is unknown, as he uses multiple birthdates and Social Security numbers.

19         13.     **Javier Rios,** age 33, of National City, California, is the sole member of JSG Capital

20 Investments, LLC.  He has been working with Gill since at least September 2014.  His professional

21 background is in food service.

22         14.     **JSG Capital Investments, LLC** is a California limited liability company formed in

23 2014.  The firm claims it is based in San Francisco and uses an unverifiable street address.  Its

24 website prominently features a photograph of the Golden Gate Bridge, and the unverifiable San

25 Francisco address, and touts various Silicon Valley venture capital firms as its "Partners & Mentors."

26 It also has additional purported offices in Beverly Hills, California, and New York City.

27

28

15.     **JSG Capital, LLC** is a California limited liability company formed in 2010, using the same San Francisco office address as JSG Capital Investments, LLC. Its California business license is currently suspended by the California Franchise Tax Board. Gill is its CEO and manager, and had control over its bank accounts, which are now closed.

16.     **JSG Capital LLC** is a California limited liability company formed in 2015, using the Beverly Hills office address described by JSG Capital Investments, LLC as one of its additional offices. Gill is its CEO and manager, and had control over its bank accounts, which are now closed.

17.     **JSG Enterprises LLC** is a California limited liability company formed in 2010, using the home address of Jaswant Gill as its main address. According to bank records, Gill is the CEO of the company. Its California business license is currently suspended by the California Franchise Tax Board.

## RELIEF DEFENDANT

18.     **JSG Management Group, LLC** is a California limited liability company formed in 2015, using the Beverly Hills office address described by JSG Capital Investments, LLC as one of its additional offices. JSG Management Group maintains a bank account into which proceeds raised from defrauded investors are transferred from other JSG Entity accounts. Rios is its manager and controls its bank accounts.

## FACTUAL ALLEGATIONS

**A.     The JSG Entities, Their Principals, and Their Purported Investment Products**

19.     JSG purports to be a San Francisco-headquartered boutique investment firm with $25 million in assets under management. JSG represents itself in marketing materials as "an independent and privately owned Investment Advisory firm" that provides "personal portfolio management attention to every client." On the firm's website and in emails to potential investors, the company also markets the fact that one of its employees is a registered investment adviser.

20.     Jaswant Gill is the founder and CEO of JSG. He makes investment decisions on behalf of JSG and, for the small percentage of investor funds that are actually invested, conducts trading of investor funds. He has personally advised investors on how to invest their money and, in

certain cases, recommended the purchase of particular securities.  He has also exercised control over, or shared control with Rios over, a number of JSG Entity bank accounts and the transfer of investor funds in those accounts.

21.     JSG purports to offer two investment products, both of which promise high returns with no risk of loss.  The first product is JSG's so-called "pre-IPO" program, which claims to allow investors to purchase shares in private companies that JSG tells clients are poised to offer securities publicly through an initial public offering, or "IPO."  Under the so-called "Promissory Conversion Investment Note Agreement" (or some variation thereof), JSG (and, in earlier contracts, JSG Capital LLC) purported to allocate to investors shares in specific, well-known private companies including Alibaba, Airbnb, and Uber prior to the company's IPO.  JSG promised investors a guaranteed fixed interest payment of up to 60 percent annually, until the company completes its IPO and the lockup period expires.  JSG represented that, at that point, it would transfer the shares or proceeds from the sale of the shares to the investor, with the investor retaining the ability to demand repayment of the initial investment if the IPO did not occur within a specified period.  The terms of the Promissory Conversion Investment Note Agreement were memorialized in contracts signed by Gill.

22.     The second product, as set forth in JSG's "Fixed Index Investment Agreement," provides that JSG will purchase securities on behalf of investors "via the indices of the NYSE and NASDAQ" using the firm's proprietary trading models.  JSG (and, in earlier contracts, JSG Capital LLC) promised investors a guaranteed fixed interest payment of up to 60 percent annually, with the rate of return dependent upon the amount and length of investment.  The firm also guaranteed repayment of the investor's initial investment in full at the end of the one-year contract term.  The terms of the Fixed Index Investment Agreement were memorialized in contracts signed by Gill.

23.     Gill and his team of operatives treat the JSG Entities as one in carrying out JSG's operations and managing investor funds.  For example, the contracts Gill signed with investors purported to be between the investor and either JSG Capital Investments, JSG Capital LLC, or "Jason Gill of JSG Capital LLC."  JSG's website is available at both www.jsgcapital.com and www.jsgcapitalinvestments.com, uses the names JSG Capital Investments, LLC and JSG Capital,

1   LLC, and refers to the "JSG Capital Group."  In addition, defendants JSG Capital LLC and JSG

2   Enterprises LLC, and relief defendant JSG Management Group LLC maintain or have maintained a

3   number of bank accounts into which investor funds were deposited (including an account in San

4   Francisco), and from which interest payments to investors were paid.  The accounts have been used

5   interchangeably, as investors who deposited money into one entity account were often issued interest

6   payments from a separate entity account.

7          24.     Rios is authorized to execute JSG's and JSG Management Group LLC's banking and

8   financing operations.  Indeed, Rios is the sole or joint owner of a number of JSG's bank accounts,

9   through which the majority of investor funds have flowed since early 2015, and has had full visibility

10  into the flow of money to and from those accounts as he exercised control over, or shared control

11  with Gill over, the accounts and the transfer of investor funds in those accounts.  He personally

12  deposited checks from investors, with subject lines showing that the funds were an investment, to

13  JSG's accounts, and personally wrote checks for the recurring interest payments made by JSG to

14  investors, indicating the purpose of the payment on the subject line.  He also personally wrote checks

15  to his own accounts.

16         **B.     JSG Solicited Investors Through a Series of Lies and Deceptive Conduct**

17         25.     JSG specifically targets middle-class investors.  Gill represented in emails to investors

18  that he started the firm to "level the playing field" and bring investment opportunities to average

19  Americans.  Gill also asserted in a JSG press release in November 2015 that the firm caters to

20  average retail investors to "give all investors access to alternative investment strategies that were

21  previously only available to the one-percenters."  Many of JSG's investors, who are scattered

22  throughout the country, have little to no prior investment experience.

23         26.     JSG solicited investors through two primary methods.  First, JSG's website touted JSG

24  investments as both safe and profitable.  It features testimonials from purported investors.

25         27.     For example, a retiree is quoted as saying: "[JSG's] fixed index [investment] has

26  allowed me to not worry about living off SSN benefits and going thru my retirement savings.  I know

27

28

1  my weekly return, and I budget accordingly to live comfortably without dipping into my savings.

2  The best investment I have ever made."

3       28.     Another purported investor testimonial displayed on the JSG website reads:  "When I

4  tell people my rate of return they tell me I'm crazy!  When I show them my monthly interest deposits

5  they ask if they can invest too!"

6       29.     JSG's second method of solicitation is through personal pitches made by Gill, Rios,

7  and other JSG employees or affiliates.  This team of solicitors, who represented themselves as JSG's

8  "Capital Raise Division," communicated directly with potential investors by email and by telephone

9  and provided them with documents and other information regarding potential investment through

10 JSG.

11      30.     Through these solicitations, defendants have made and continue to make numerous,

12 material misrepresentations to investors and have taken additional steps to deceive investors into

13 believing that JSG is a legitimate investment firm offering lucrative opportunities in the stock and

14 "pre-IPO" markets, and that their money is safe and secure.  Each of these misrepresentations and

15 deceptive conduct, described below, fall into three general categories:  lies regarding the investments

16 themselves, JSG's ability to procure such investment opportunities, and that investor funds are

17 secured against future loss.

18     **1.  JSG, JSG Capital LLC, JSG Capital, LLC, Gill, and Rios Falsely Told Investors**

19         **That Their Money Was To Be Used To Purchase "Pre-IPO" Shares Or Invested**
          **In the Stock Market.**

20

21      31.     JSG's website features the firm's investment philosophy beside a picture of the New

22 York Stock Exchange trading floor and sets forth a supposed four-step "investment process" that

23 purports to rely "on concentrated research to identify great businesses that are trading at highly

24 discounted valuations because investors have overreacted to negative macro or company-specific

25 events."  The website also claims that JSG manages a "customized asset allocation strategy" for each

26 client, that a client's objectives "determine the level of investment in equities, fixed income and

27 alternative investments," and that JSG "actively manage[s] client portfolios using a broad array of

28 securities."

32.     JSG's website also features a number of charts to convey the impression that JSG is actively investing in the stock market.  One table reflects JSG's purported "monthly returns" to investors, based on the duration and amount of investment.  Another graph claims that JSG's fixed index product outperformed benchmarks such as Apple, GE, and the S&P 500 from 2010 to 2015.  And a final chart, titled "2015 Yearly Gains of Our AUM," lists well-known stocks such as Apple, Google, and Netflix that "are a sample of the core equities under management (AUM) that JSG Capital Investments LLC actively trades or holds daily."

33.     The investor contracts themselves represent that JSG placed investor money in the market.  Thus, each of the fixed index contracts states:  "This is an investment note for the purchase of equities both long and short positions via the indices of the NYSE and NASDAQ."  Similarly, the so-called "pre-IPO" contracts purport to allocate a specific number of IPO shares to the investor at a specific price.  Gill signed each of these contracts on behalf of JSG or its affiliate, JSG Capital LLC.

34.     Gill also mirrored these representations in communications directly with investors.  For example, in an email with one would-be investor, Gill stated that JSG Capital LLC had been allocated "pre-IPO" Alibaba shares, and encouraged the potential investor to take a loan or credit card advance to "purchase as many shares as possible and leverage the return" as such an investment "could change your life."  Gill further represented that the "pre-IPO" contract would confirm the shares, price, and interest payment guarantee relating to the Alibaba investment, and that following the expiration of the lockup period the investor would receive actual stock certificates for any shares purchased.

35.     Rios similarly led investors to believe that their funds were being invested.  For example, Rios sent an email to a potential investor representing that JSG specializes "in helping the average investor (i.e. middle class) participate in investment vehicles previously only allowed for high net worth clients."  Rios proceeded to describe JSG's purported investment products and "investment philosophy" and claimed that JSG's average trading profits ranged from $50,000 to $800,000 per day, and that JSG maintained over 500 clients nationwide.

36.     Other JSG marketing materials perpetuate the myth that the firm was actively managing investor funds in the market.  In November 2015, a member of the Capital Raise Division circulated an email to the other members of the team (including Gill and Rios) with an updated "Investor Relations Information Sheet" to be circulated to "any future investors."  The document highlighted JSG's business as an investment advisory firm, provided information on JSG's core investment products, and represented that JSG had $25 million in assets under management.

37.     In fact, these representations were false.  Neither JSG nor its affiliated entities has, and has never had, $25 million in assets under management.  More importantly, despite their claims that JSG investor funds are used to purchase so-called "pre-IPO" shares or to otherwise invest in the market, defendants actually operate a classic Ponzi scheme.

38.     Since September 2013, investors transferred approximately $10 million into a series of JSG-affiliated bank accounts opened by Gill, Rios, and two other individuals, ostensibly for the purpose of investment in the stock market or to purchase "pre-IPO" shares of private companies. Investors were directed by JSG principals to deposit funds directly in any one of these accounts, in the names of defendants JSG Capital Investments, LLC, JSG Capital LLC, or JSG Enterprises LLC. An additional $1.2 million in cash and other funds from an unknown source has also been deposited in the accounts over the same period.

39.     However, of the $11.2 million deposited to date, only $844,400 was ever invested.  Of this amount, just $99,800 – less than 1 percent of known investor funds – was transferred to JSG Entity brokerage accounts for investment in the market.  Instead, Gill and Rios transferred the overwhelming majority of the $844,400 into their personal brokerage accounts and those of other JSG insiders, where the money was traded in the market and spent on personal expenses.  And no investor funds were used for the purpose of buying "pre-IPO" shares of private companies.

40.     Gill and Rios misappropriated the remaining investor funds.  First, unbeknownst to investors, defendants used money from new investment into JSG to pay existing investors.  Since September 2013, defendants have made approximately $4.2 million in Ponzi-like payments to JSG investors.

41.     Second, Gill and Rios have used the balance of the funds to enrich themselves and other JSG insiders, to the detriment and at the expense of JSG's investors.  Collectively, Gill and Rios have misappropriated for their personal use, or have inappropriately diverted to other JSG insiders, at least $6.1 million in total funds deposited to date.

42.     Specifically, Rios received approximately $1.7 million in direct transfers into his personal accounts or in cash withdrawals, and Gill received $289,131 into his personal accounts or in cash withdrawals.  Rios personally withdrew, in cash, $210,000 of investor money from a JSG account in a single transaction.

43.     Additionally, Gill wrongfully obtained nearly $800,000 in cash or other benefits through the use of ATM withdrawals and a prepaid expense card, which he used to pay for, among other things, jaunts to Las Vegas casinos, gentlemen's clubs, professional sporting events, high-end hotels, and luxury retail stores.

44.     None of the documents Gill, Rios, or any of the JSG Entities provided to investors disclosed and/or authorized the use of investor money for these purposes.

45.     Gill and Rios knew, or were reckless in not knowing, that investor funds were being used to carry out the scheme.  Gill and Rios are account signatories for 17 of the 22 JSG-affiliated bank accounts, with full authority over account transactions.  Gill and Rios thus had visibility into, and in many cases the sole ability to direct transactions regarding, the activity on these accounts.

46.     Gill knew, or was reckless in not knowing, that his representations made to investors regarding how their funds were to be invested were false.  Gill knew that neither JSG nor JSG Capital LLC was allocated any shares in Alibaba, Airbnb, Uber, and others, despite his representations to the contrary.  Gill also knew, as the authorized signatory of JSG Entity bank accounts, that investor money was not being used for investment purposes, but instead was used for payments to JSG insiders (including Gill), personal expenses, and to make Ponzi payments to other investors.  Despite this knowledge, Gill wrote and signed checks to investors that falsely claimed that the payments were for investment returns, describing those payments as "Reimbursement" or that included "Interest" for certain investments.

47.     Rios knew, or was reckless in not knowing, that his representations made to investors regarding how their funds were to be invested were false.  As the person in control of JSG's bank accounts, Rios had full visibility into JSG's banking records, which showed that investor money was used for payments to JSG insiders (including Rios), personal expenses, and to make Ponzi payments to other investors.  Despite this knowledge, Rios wrote and signed checks to investors that falsely claimed that the payments were for investment returns, stating for example, "Alibaba Reimbursement" and "JSG Monthly Interest."

**2.   Gill, JSG, and JSG Capital, LLC Lied About Gill's Background and Relationships to Perpetuate the Façade That JSG Is a Legitimate Investment Firm.**

48.     Gill and JSG, and, through the website, JSG Capital, LLC, furthered the scheme by lying about Gill's background and by pretending that Gill has connections to well-known Silicon Valley venture capital firms, to create the false impression that JSG had access to investment opportunities in private companies before they offered their stock to the general public.

49.     JSG's website claims that its "greatest competitive advantage comes from using our relationships and networking to discuss with top tier analysts on Wall Street and management members of companies we have invested in."  To that end, the site boasts that Gill founded the investment advisory firm following his career as a Managing Director at Morgan Stanley, during which he participated in the initial public offerings of well-known technology companies.

50.     JSG's website also touts Gill's supposed "close ties" to particular Silicon Valley venture capitalist firms.  This assertion is backed by a list of individuals at a few of the firms that comprise JSG's purported "Partners and Mentors."

51.     Gill himself also used this purported background to woo investors.  He claimed in emails that he was previously employed at Morgan Stanley and managed that company's Investment Banking Division in New York.  He also told investors that he worked on "numerous deals" while at Morgan Stanley.  He also led investors to believe that his connections enabled him to secure such lucrative and highly-coveted private company shares that were otherwise unavailable to the general public.  He told one investor, "Due to my relationship and dealings with Morgan Stanley, my firm

1  has been allocated a certain number of shares [of private company Alibaba] that we will be giving to

2  our high net worth clients and investors as well as keeping some for the firm."

3          52.     In reality, however, Gill has no such background.  There is no record of Gill ever

4  being employed at Morgan Stanley, either in the Investment Banking Division or as a Managing

5  Director.  As such, he did not participate in the initial public offerings of any technology companies

6  while at Morgan Stanley.  And neither Gill nor JSG has ever had a relationship with the above-

7  referenced venture capital firms.

8          53.     Gill knew, or was reckless in not knowing, and therefore by extension JSG and JSG

9  Capital, LLC knew, or were reckless in not knowing, that these representations regarding Gill's

10  background and relationships were false.

11          **3.  Gill, JSG, JSG Capital LLC, and JSG Capital, LLC Deceived Investors Into
            Believing That Their Investments Were Secured By JSG Assets and Protected By
12          an Insurance Policy.**

13          54.     Gill, JSG, and JSG's affiliated entities also gave investors a false sense of security by

14  misrepresenting that their investments were secured and protected against losses.

15          55.     Both JSG's "pre-IPO" and fixed index contracts with investors, which Gill signed on

16  behalf of JSG or JSG Capital LLC, represented that the investments were secured by assets in JSG-

17  affiliated accounts at two well-known brokerage firms.  For example, one investor's "Pre-IPO"

18  contract stated that "This Note is secured by assets of JSG Capital LLC with portfolio asset accounts

19  at [Firm A] and [Firm B] (Trading Partner)."  Similarly, another investor's "fixed index" contract

20  stated that "This Note is secured by assets of JSG Capital LLC with accounts at [Firm A] and [Firm

21  B] – Trading Desk Partner (Prime Brokerage)."

22          56.     These representations were false.  The JSG Entities do not have any accounts at Firm

23  B.  Although JSG does maintain an account at Firm A, the account has never had an ending monthly

24  balance of more than $5,000.

25          57.     Gill took additional steps to further the deceit.  In a January 2016 email, Gill sent his

26  team a series of documents to aid them in closing deals with potential investors that were "on the

27  fence or [who] need[] assurance."  One attachment purported to be a brokerage statement from Firm

28

1  A, reflecting JSG's account balance of over $32 million as of November 30, 2015.  At least one

2  potential investor received a copy of the purported brokerage statement from a member of Gill's

3  team.

4        58.      However, the November 2015 statement was a fake, as the balance in the account was

5  never more than $5,000.  Gill knew, or was reckless in not knowing, that the document was fake.

6        59.      Gill, JSG, and JSG Capital, LLC also falsely told investors that their investments were

7  protected against losses through an insurance policy and the firm's membership in the Securities

8  Investor Protection Corporation ("SIPC").  Until very recently, JSG's website stated, under "Asset

9  Protection," that investments through JSG "are Insured by SIPC for securities and cash in the event of

10 broker-dealer failure" and that "SIPC provides up to $500,000 of protection for brokerage accounts

11 held in each separate capacity (e.g., joint tenant or sole owner), with a limit of $250,000 for claims of

12 uninvested cash balances."  The website further represented that investors are additionally protected

13 against loss through a "brokerage insurance" policy issued by a particular insurance company, thus

14 cumulatively providing protection to investors "up to an aggregate of $100 million."

15       60.      JSG's and JSG Capital LLC's contracts with investors, which Gill signed, echo these

16 misrepresentations, stating that the individual investor "will be listed as a beneficiary for his [or her]

17 principal investment amount . . . with [insurance company]" and that "[i]n the event of a loss the

18 'Investor' is eligible to file a claim at [email address]."  The contracts also state that the investors are

19 "protected via SIPC insurance for any investment up to $250,000."

20       61.      These representations are false.  Neither JSG nor its affiliated entities have an

21 insurance policy with the company in question, and none of the JSG Entities are members of the

22 Securities Investor Protection Corporation.

23       62.      Gill furthered this fraud in a January 2016 email to his team in which he attached a

24 purported copy of JSG's "Asset Management Insurance Policy" through the insurance company.  He

25 attached another document, known as JSG's "ASSET PROTECTION SHEET," which explained that

26 investors were provided "a high level of safety with your investment accounts," including the

27

28

1  protection against loss through JSG's SIPC membership.  At least one investor received the Asset

2  Protection Sheet from a member of Gill's team.

3         63.    As Gill knew, or was reckless in not knowing, these documents are fake, since JSG

4  had no such insurance policy through the insurance company and is not a member of the SIPC.

5         **C.    Defendants Are Operating an Ongoing Ponzi Scheme**

6         64.    Gill and Rios, through the JSG Entities, continue to operate a Ponzi scheme, soliciting

7  new investors into JSG and making payments to earlier investors.  The defendants also continue to

8  dissipate investor funds.  From March 1, 2016 through May 6, 2016, investors placed approximately

9  $2.5 million with JSG.  Of this amount, just over $1 million was used to pay back investors, with the

10 remaining $1.4 million primarily used to make payments to JSG insiders or for their benefit.  Less

11 than $100,000 now remains in the JSG Entity accounts.  Based on the misrepresentations to JSG

12 investors and the misappropriation of millions of dollars in investor assets, emergency relief is

13 needed to preserve the funds presently in the defendants' and Relief Defendants' accounts.  Indeed,

14 unless restrained and enjoined, defendants are reasonably likely to continue to violate the federal

15 securities laws through their ongoing operations.

16                        **FIRST CLAIM FOR RELIEF**

17     **(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 by All Defendants)**

18        65.    The Commission hereby incorporates Paragraphs Nos. 1 through 64 by reference.

19        66.    By engaging in the conduct described above, defendants Gill, Rios, and the JSG

20 Entities directly or indirectly, by use of means or instrumentalities of interstate commerce, or of the

21 mails, or of a facility of a national securities exchange, in connection with the purchase or sale of

22 securities, with scienter,

23              (a)    employed devices, schemes, and artifices to defraud;

24              (b)    made untrue statements of material fact and omitted to state material facts

25                     necessary in order to make the statements made, in the light of the

26                     circumstances under which they were made, not misleading; and

27

28
SEC v. JSG Capital Investments, LLC, et al.         14
Complaint

1        (c)     engaged in acts, practices, and courses of business that operated or would

2             operate as a fraud or deceit upon any person.

3      67.    By reason of the foregoing, defendants Gill, Rios, and the JSG Entities violated and,

4  unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C.

5  § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

6                              **SECOND CLAIM FOR RELIEF**

7           **(Violations of Section 17(a) of the Securities Act by All Defendants)**

8      68.    The Commission hereby incorporates Paragraphs Nos. 1 through 64 by reference.

9      69.    By engaging in the conduct described above, defendants Gill, Rios, and the JSG

10  Entities directly or indirectly, in the offer or sale of securities, by use of the means or instruments of

11  transportation or communication in interstate commerce or by use of the mails,

12        (1)     with scienter, employed devices, schemes, and artifices to defraud;

13        (2)     obtained money or property by means of untrue statements of material fact and

14             by omitting to state a material fact necessary in order to make the statements

15             made, in light of the circumstances under which they were made, not

16             misleading; and

17        (3)     engaged in transactions, practices, or courses of business that operated or

18             would operate as a fraud or deceit upon purchasers.

19      70.    By reason of the foregoing, defendants Gill, Rios, and the JSG Entities violated and,

20  unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C.

21  § 77q(a)].

22                               **THIRD CLAIM FOR RELIEF**

23      **(Violations of Sections 206(1) and (2) of the Advisers Act by Gill and JSG)**

24      71.    The Commission hereby incorporates Paragraphs Nos. 1 through 64 by reference.

25      72.    By engaging in the conduct described above, defendants Gill and JSG directly or

26  indirectly, by use of the mails or any means or instrumentality of interstate commerce, and while

27

28

1   engaged in the business of advising others for compensation as to the advisability of investing in,

2   purchasing, or selling securities:

3                (1)        with scienter employed devices, schemes, and artifices to defraud clients or

4                           prospective clients; and

5                (2)        engaged in acts, practices, or courses of business which operated or would

6                           operate as a fraud or deceit upon clients or prospective clients.

7        73.      By reason of the foregoing, defendants Gill and JSG have violated and, unless

8   restrained and enjoined, will continue to violate Sections 206(1) and (2) of the Advisers Act [15

9   U.S.C. §§ 80b-6(1), 80b-6(2)].

10                          **FOURTH CLAIM FOR RELIEF**

11                                  **(Relief Defendant)**

12       74.      The Commission hereby incorporates Paragraphs Nos. 1 through 64 by reference.

13       75.      Relief Defendant JSG Management Group, LLC received and may continue to hold

14   investor funds and/or assets purchased with investor funds that were obtained through violations of

15   the federal securities laws, as alleged above.

16       76.      As set forth above, investor funds were transferred into bank accounts held in the

17   names of JSG Management Group, LLC.

18       77.      Relief Defendant does not have a legitimate claim to the funds obtained.

19

20                              **PRAYER FOR RELIEF**

21           WHEREFORE, the Commission respectfully requests that the Court:

22                                        I.

23       Enjoin defendants Gill, Rios, JSG Capital Investments, LLC, JSG Capital, LLC, JSG Capital

24   LLC, and JSG Enterprises, LLC temporarily, preliminarily, and permanently from, directly or

25   indirectly, violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the

26   Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section

27   206 of the Advisers Act [15 U.S.C. § 80b-6].

28

II.

Enter an order restraining and enjoining defendants Gill, Rios, JSG Capital Investments, LLC, JSG Capital, LLC, JSG Capital LLC, and JSG Enterprises, LLC temporarily, preliminarily, and permanently from, directly or indirectly, participating in the issuance, offer, or sale of any security of or through any entity controlled by, or under joint control with, any of them, including but not limited to securities of JSG Capital Investments, LLC, JSG Capital LLC, JSG Capital, LLC, and/or JSG Enterprises, LLC, and in particular the securities described as "Pre-IPO Promissory Notes" or "Fixed Return Investment Agreements" marketed by defendants, as well as the offer or sale of securities and the acceptance of any money or anything of value by any defendant for such securities.

III.

Enter an order restraining and enjoining defendants Gill, Rios, JSG Capital Investments, LLC, JSG Capital, LLC, JSG Capital LLC, and JSG Enterprises, LLC temporarily, preliminarily, and permanently from, directly or indirectly, soliciting any person or entity to purchase or sell any security.

IV.

Enter an order freezing the assets of defendants Gill, Rios, JSG Capital Investments, LLC, JSG Capital, LLC, JSG Capital LLC, and JSG Enterprises, LLC and Relief Defendant JSG Management Group, LLC.

V.

Enter an order requiring defendants Gill, Rios, JSG Capital Investments, LLC, JSG Capital, LLC, JSG Capital LLC, and JSG Enterprises, LLC to prepare a sworn accounting of all money obtained from investors, including (1) a report on the disposition and current location of the money, (2) disclosure of all bank, brokerage, escrow, and financial accounts where investor money was deposited, and (3) the production or consent to the production of internal accounting records maintained in QuickBooks or equivalent software.

## VI.

Enter an order prohibiting the movement, alteration, and destruction of books and records to protect the books and records showing the location of assets and the disposition of investors' money and to protect all remaining documents necessary for full discovery in this matter, and to permit expedited discovery to obtain additional evidence before a preliminary injunction hearing.

## VII.

Enter an order requiring defendants Gill, Rios, JSG Capital Investments, LLC, JSG Capital, LLC, JSG Capital LLC, and JSG Enterprises, LLC and Relief Defendant JSG Management Group, LLC to disgorge the ill-gotten gains received as a result of the violations alleged herein, plus prejudgment interest thereon.

## VIII.

Enter an order requiring Defendants Gill, Rios, JSG Capital Investments, LLC, JSG Capital, LLC, JSG Capital LLC, and JSG Enterprises, LLC to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

## IX.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## X.

Grant such other and further relief as this Court may determine to be just, equitable, and necessary.

Dated:  May 25, 2016                         Respectfully submitted,


                                             /s/ Ruth L. Hawley
                                             RUTH L. HAWLEY
                                             Attorney for Plaintiff
                                             SECURITIES AND EXCHANGE COMMISSION