JINA L. CHOI (NY Bar No. 2699718)
ERIN E. SCHNEIDER (Cal. Bar No. 216114)
  schneidere@sec.gov
JASON M. HABERMEYER (Cal. Bar No. 226607)
  habermeyerj@sec.gov
ANDREW J. HEFTY (Cal. Bar No. 220450)
  heftya@sec.gov
RUTH L. HAWLEY (Cal. Bar No. 253112)
  hawleyr@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 705-2500

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>         Plaintiff,<br><br>    v.<br><br>JSG CAPITAL INVESTMENTS, LLC, JSG CAPITAL, LLC, JSG CAPITAL LLC, JSG ENTERPRISES, LLC, JASWANT S. GILL, AND JAVIER RIOS,<br><br>         Defendants,<br><br>JSG MANAGEMENT GROUP LLC,<br>Relief Defendant. | Case No.<br><br><br>PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE GRANTED, AND MEMORANDUM IN SUPPORT OF THEREOF |

# TABLE OF CONTENTS

MOTION FOR TEMPORARY RESTRAINING ORDER ...........................................................1

MEMORANDUM IN SUPPORT OF MOTION...................................................................................1

I.   INTRODUCTION ...........................................................................................................................1

II.  STATEMENT OF FACTS ..............................................................................................................2

    A.  Defendants Create the Façade of Running a Legitimate Investment Firm. ...............2

    B.  Defendants Gill and Rios Solicit Investors.. ..............................................................4

    C.  Investors Enter Into Either the "Fixed Index" or "Pre-IPO" Agreement..................5

    D.  Defendants' Representations to Investors Are False. .................................................7

        1. Gill and JSG's Claims to Industry Connections and Account
        Security Are False ...............................................................................................7

        2. Defendants Do Not Invest In Stock or Sell "Pre-IPO" Shares But
        Instead Operate a Classic Ponzi Scheme .........................................................8

III.  ARGUMENT..................................................................................................................................10

    A.  Standard For Injunctive Relief In SEC Enforcement Actions ..................................10

    B.  The SEC Has Made a *Prima Facie* Showing That Defendants Are Violating Federal
    Securities Laws. .......................................................................................................11

        1. Defendants' Pre-IPO Promissory Notes and Fixed Index
        Agreements That Were Sold to Investors Are Securities ................................12

        2. Defendants Engaged in a Scheme to Defraud in Violation of Sections
        10(b) and Rules 10b-5(a) and (c)of the Exchange Act, and Sections
        17(a)(1) and 17(a)(3) of the Securities Act .......................................................14

        3. Gill, Rios, JSG Capital LLC, JSG Capital, LLC and JSG Capital
        Investments Made Materially False and Misleading Statements in
        Violation of Section 10(b) and Rule 10b-5(b) of the Exchange Act, and
        Section 17(a)(2) of the Securities Act...............................................................17

4. JSG Capital Investments and Gill Violated the Antifraud Provisions of the Advisers Act .................................................................................20

C.  Defendants' Violations Will Likely Be Repeated . ...................................................21

D.  The Asset Freezes and Discovery Orders Are Necessary . ........................................22

1. Asset Freezes Are Appropriate and Necessary  .................................................22

2. An Order Prohibiting the Destruction of Documents, Granting Expedited Discovery and Requiring an Accounting Are Necessary ...................24

IV.  CONCLUSION ................................................................................................................25

# TABLE OF AUTHORITIES

<u>CASES</u>

*Aaron v. SEC*, 446 U.S. 680 (1980) .......................................................................... 15

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ............................................................ 18

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 387 F.3d 468 (6th Cir. 2004) ............... 15

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ..................................................... 15

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999) ........................................ 23

*Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624 (1988) ................................................. 22

*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir. 1990) ............................... 15,17

*In re Bartake*, 57 S.E.C. 488, 2004 SEC LEXIS 806
   (Apr. 8, 2004) ..................................................................................... 12

*In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077 (N.D. Cal. 2001) ..................................... 17

*In re Software Toolworks Inc.*, 50 F.3d 615 (9th Cir. 1994) .......................................... 15

*In re United Energy Corp.*, 944 F.2d 589 (9th Cir. 1991) ............................................. 15

*Janus Capital Grp., Inc. v. First Derivative Traders,* 564 U.S. 135 (2011) ......................... 18

*Johnston v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) ................................................ 23

*Reebok Int'l, Ltd v. Marnatech Enters., Inc.*, 970 F.2d 552 (9th Cir. 1992) ......................... 23

*Reves v. Ernst & Young*, 494 U.S. 56 (1990) .......................................................... 12

*SEC v. Better Life Club of America, Inc.*, 995 F. Supp. 167 (D.D.C. 1998) ........................... 19

*SEC v. Capital Cove Bancorp, LLC*, 2015 WL 9704076 (C.D. Cal. Sept. 1, 2015) ....................... 11

*SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963) ................................... 20

*SEC v. Cavanagh,* 155 F.3d 129 (2d Cir. 1998) ....................................................... 24

*SEC v. Credit First Fund, LP*, 2006 WL 4729240 (C.D. Cal. Feb. 13, 2006) ........................... 11

*SEC v. Dain Rauscher, Inc.*, 254 F.3d 852 (9th Cir. 2001) ........................................... 11

*SEC v. eAdgear, Inc.*, 2014 U.S. Dist. LEXIS 170159 (N.D. Cal. Dec. 8, 2014) ....................... 22

*SEC v. Edwards*, 540 U.S. 389 (2004) ................................................................ 13

iii

*SEC v. Fehn*, 97 F.3d 1276 (9th Cir. 1996).................................................................... 21

*SEC v. Hickey*, 322 F.3d 1123 (9th Cir. 2003).............................................................. 23

*SEC v. Homestead Props., L.P.*, 2009 WL 5173685 (C.D. Cal. Sept. 8, 2009).......................... 11

*SEC v. Int'l Swiss Invs. Corp.*, 895 F.2d 1272 (9th Cir. 1990) ............................................ 23, 24

*SEC v. Loomis*, 969 F.Supp.2d 1226 (E.D. Cal. 2013) .................................................. 15

*SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975)................................. 10

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972)................................. 15, 23

*SEC v. Morriss*, 2012 WL 6822346 (E.D. Mo. Sept. 21, 2012) ........................................ 20, 21

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) ........................................................... 21

*SEC v. Pac. West Capital Grp., Inc.*, 2015 WL 9694808 (C.D. Cal. June 6, 2015) .................... 11

*SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125 (9th Cir. 1991) ..................................... 13, 14

*SEC v. Rubera*, 350 F.3d 1084 (9th Cir. 2003) ................................................... 12, 13, 14

*SEC v. Schooler*, 902 F. Supp. 2d 1341 (S.D. Cal. 2012) .............................................. 11

*SEC v. Sells*, 2012 WL 3242551 (N.D. Cal. Aug. 10, 2012) ............................................. 14

*SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992)......................................................... 20

*SEC v. Trabulse,* 526 F. Supp. 2d 1008 (N.D. Cal. 2007) ............................................... 22

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) ..................................................... 23

*SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1196 (11th Cir. 1999) .................................. 11

*SEC v. United Fin. Grp., Inc.*, 474 F.2d 354 (9th Cir. 1973)........................................... 11, 21

*SEC v. U.S. Sustainable Energy Corp.*, 2011 WL 2980549 (S.D. Miss. July 21, 2011) .............. 19

*SEC v. W.J. Howey Co.*, 328 U.S. 295 (1946) ........................................................... 12

*SEC v. Wencke*, 622 F.2d 1363 (9th Cir. 1980) ........................................................ 23

*SEC v. Zandford,* 535 U.S. 813 (2002) ................................................................. 12

*Simpson v. AOL Time Warner*, 452 F.3d 1040 (9th Cir. 2006) ....................................... 14

*United States v. Carman*, 577 F.2d 556 (9th Cir. 1978) .............................................. 14

iv

*United States v. Elliott*, 62 F.3d 1304 (11th Cir. 1996)........................................................ 20, 21

*United States v. Odessa Union Warehouse Co-Op*, 833 F.2d 172 (9th Cir. 1987)...................... 21

*Vernazza v. SEC*, 327 F.3d 851 (9th Cir. 2003) ............................................................... 15

*Warfield v. Alaniz*, 569 F.3d 1015 (9th Cir. 2009) ........................................................ 12, 13


STATUTES AND REGULATIONS

15 U.S.C.
    § 77b(1) ................................................................................................. 12
    § 77c(a)(10) ............................................................................................. 12
    § 77q(a) .................................................................................................. 11
    § 77q(a)(1) .............................................................................................. 14
    § 77q(a)(2) .............................................................................................. 17
    § 77q(a)(3) .............................................................................................. 14
    § 77t(b) ............................................................................................... 1, 11
    § 78j(b) ......................................................................................... 11, 14, 17
    § 78u(d) .............................................................................................. 1, 11
    § 80b-2(a)(11) .......................................................................................... 20
    § 80b-6(a)(1)-(2) ....................................................................................... 20
    § 80b-9(d) ............................................................................................ 1, 11

17 C.F.R.
    § 240.10b-5 ........................................................................................... 11
    § 240.10b-5(a) ........................................................................................ 14
    § 240.10b-5(b) ........................................................................................ 17
    § 240.10b-5(c) ........................................................................................ 14

MOTION FOR TEMPORARY RESTRAINING
ORDER; MEMO IN SUPPORT THEREOF

CASE NO. _____

### MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiff Securities and Exchange Commission (the "SEC" or "Commission") hereby moves, *ex parte*, for a temporary restraining order ("TRO") and other preliminary relief against defendants JSG Capital Investments, LLC, JSG Capital, LLC, JSG Capital LLC, JSG Enterprises, LLC, Jaswant S. Gill, a.k.a. Jason Gill, and Javier Rios (collectively, "defendants") and relief defendant JSG Management Group LLC.  In particular, the Commission moves the Court for an immediate order: (1) enjoining defendants from violating the antifraud provisions of the federal securities laws; (2) enjoining defendants from selling or purchasing certain securities; (3) enjoining defendants from soliciting the purchase or sale of securities; (4) freezing assets of defendants and the relief defendant; (5) prohibiting the destruction of documents; (6) granting expedited discovery; (7) requiring an accounting; and (8) requiring defendants to show cause why the Court should not issue a Preliminary Injunction imposing the requested relief during the pendency of this action.

The Commission's motion is brought pursuant to Section 20(b) of the Securities Act of 1933, 15 U.S.C. § 77t(b), Section 21(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d), and Section 209(d) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-9(d), which authorize restraining orders and injunctions upon the Commission's proper showing.  The Commission's motion is supported by the Memorandum herein; the simultaneously filed Declarations of Ruth L. Hawley, John A. Roscigno, Michelle Chung, Tracy Johnston, and Alla Karpuk in Support of Plaintiff's Motion for Temporary Restraining Order and the exhibits thereto; and the [Proposed] Order Granting Temporary Restraining Order and Other Preliminary Relief and Order to Show Cause Why a Preliminary Injunction Should Not Be Granted.

In compliance with Civil Local Rule 65-1(b), the Commission's counsel has provided notice of this Motion to defendants and relief defendants.  *See* Declaration of Ruth L. Hawley in Support of TRO ("Hawley Decl.") ¶ 18.

### MEMORANDUM IN SUPPORT OF MOTION

## I.    INTRODUCTION

Defendants are engaged in the fraudulent offering of securities through a classic Ponzi scheme.  Since 2013, defendants have been operating a scheme that solicits investors through word-

of-mouth and a website, touting the opportunity to make significant returns by investing in stock or shares of popular private companies that defendants assert will soon go public.  Through lies and an utterly false façade premised on investments that are never made, defendants have already conned at least 188 individuals into making approximately $10 million of investments.  Defendants' business model lacks any income from investments and instead is a classic Ponzi scheme, which depends entirely on finding new investors so that they can pay returns to existing ones.

To halt this fraud, the SEC seeks an order temporarily and immediately restraining defendants from further violations and specifically prohibiting defendants from soliciting new investors.  Further, to preserve the *status quo*, the SEC seeks an order freezing assets of defendants and relief defendants.  Finally, the SEC seeks an order prohibiting the destruction of documents, granting expedited discovery, and requiring an accounting.

## II.     STATEMENT OF FACTS

### A.     Defendants Create the Façade of Running a Legitimate Investment Firm

Defendants distribute a host of information to prospective investors to convince them to invest.  One of the most accessible sources of such information is JSG Capital Investments' website, www.jsgcapital.com, which is filled with purported information about the company, a "boutique investment firm specializing in sustainable growth for all investors."  *See* Hawley Decl. ¶ 8, Ex. O.[1] Its homepage displays the Golden Gate Bridge and San Francisco skyline as testimonials from investors scroll in succession, touting the company's investments as both safe and highly lucrative.  *Id.*[2]  Not surprisingly, numerous references on the website state that this "investment firm" makes profits through investments in stocks.  For example, the company's purported "investment strategies"

---

[1] The website references both JSG Capital Investments, LLC and JSG Capital, LLC.  *See* Hawley Decl. ¶ 8, Exs. O-V.  Representations on the website are therefore attributable to both corporate entities.  To prevent repeating this fact, this Motion makes reference to JSG Capital Investments, LLC in relation to the website without waiving JSG Capital, LLC's liability for it.

[2] For example, one investor is quoted saying "[JSG's] fixed index [investment] has allowed me to not worry about living off SSN benefits and going thru my retirement savings.  I know my weekly return, and I budget accordingly to live comfortably without dipping into my savings.  The best investment I have ever made."  Hawley Decl. ¶ 8, Ex. O at 2.  Another investor is quoted saying "When I tell people about my rate of return they tell me I'm crazy!  When I show them my monthly interest deposits they ask if they can invest too!"  *Id.* at 4.

claim a "competitive advantage" that "comes from using our relationships and networking to discuss with top tier analysts on Wall Street and management members of companies we have invested in." *Id*. Ex. P.  The company's four step "investment process" purports to "rely on concentrated research to identify great businesses that are trading at highly discounted valuations because investors have overreacted to negative macro or company-specific events."  *Id*. Ex. Q at 1.  Step 2, "Asset Allocation," is identified as "the simultaneous use of multiple investments, which may include equities, fixed income and alternative investments to reduce the overall risk and enhance the return of a portfolio."  *Id*. at 3.  Step 3, "Continuous Management," states "[w]e construct individual equity, fixed income and balanced portfolios.  We actively manage client portfolios using a broad array of securities."  *Id*. at 4.  The website includes a chart with "monthly returns" ranging from 1 percent to 2.66 percent, another that compares the returns of the "JSG Fixed Index" investment to those of Apple, GE, and the S&P 500, and a third that lists certain "stocks," including Apple, Google, and Netflix, that "are a sample of the core equities under management (AUM) that JSG Capital Investments LLC actively trades or holds daily."  *Id*. Exs. R-T.

The website's "meet the team" page states that Jason Gill, the CEO of JSG Capital Investments, "founded the boutique investment advisory firm in 2006 after a career on Wall Street," and while at Morgan Stanley "participated with Initial Public Offerings, such as Juniper Networks IPO in 1999, Salesforce in 2004 and Google's IPO in 2004."  *Id*. Ex. V at 1.  The website further claims that Gill has "close ties to venture capitalists at Sequoia Capital, Kleiner Perkins Caulfield & Byers, Benchmark Capital, Andreessen Horowitz and GGV Capital."  *Id*.  This last assertion is backed by a list of purported "Partners and Mentors," which include "Benchmark Capital – Bill Gurley," "GGV Capital – Hany Nada," and "Kleiner Perkins – Vinod Kholsa [sic] (Kholsa [sic] Ventures)."  *Id*. at 2.

JSG Capital Investments also issued a November 15, 2015 press release, which investors received, that similarly claimed the company invests in stocks and businesses to achieve returns.  *See Id*. ¶ 6, Ex. I.  The release referred to JSG Capital Investments as a boutique investment firm offering "portfolio management services for clients across the United States."  *Id*.  It contained a chart with returns ranging from 12 percent to 60 percent annually, stating that "JSG Capital Investments is able

1  to offer these returns by taking advantage of short-term market factor reactions that have little impact

2  on long-term intrinsic values." *Id.*

3        **B.**    **Defendants Gill and Rios Solicit Investors**

4        A team of JSG solicitors, the "Capital Raise Division," work through calls and emails to

5  entice potential investors.  The team consists of Gill, Javier Rios, and others.  Gill purports to have a

6  background in investment banking, telling one investor that he "worked at Morgan Stanley for about

7  7 years heading their Investment Banking Division in New York" before opening his venture capital

8  firm in order to "level[] the playing field" and bring lucrative investment opportunities to average

9  Americans.  *See* Declaration of Tracy Johnston in Support of TRO ("Johnston Decl.") ¶ 3, Ex. A at 1,

10  4.  Gill claims that his relationships afford him opportunities to acquire and then sell to investors

11  shares of well-known private companies that Gill asserts will soon go public.  For example, Gill told

12  one investor, "[d]ue to my relationship and dealings with Morgan Stanley, my firm has been allocated

13  a certain number of shares [of then-private Chinese company Alibaba] that we will be giving to our

14  high net worth clients and investors as well as keeping some for the firm.  Ive [sic] delegated our

15  disbursement department too [sic] allocate about 100k shares for friends and family."  *Id.* at 4.  Gill

16  urged the investor to capitalize on the opportunity to acquire these shares at the "pre-ipo price,"

17  boasting that the potential returns were a "game-changer" and stating that "these shares will be

18  consumed rather quickly" and that "[w]hile I can't tell prospective clients what to do, I would

19  purchase as many shares as possible and leverage the return."  *Id.* at 4-5.

20        Gill provided material to the Capital Raise Division to give to investors.  For example, on

21  January 8, 2016, Gill emailed documents to a member of JSG's Capital Raise Division and another

22  team member that Gill believed would "help [with] any client here in the US that is on the fence or

23  needs assurance."  Hawley Decl. ¶ 5, Ex. C.  One attachment purported to be a report from Fidelity

24  Investments showing a $32,078,790.04 balance in JSG Capital Investments' brokerage account as of

25  November 30, 2015.  *Id.* Ex. E.  Another purported to be a policy from Nationwide Insurance that

26  insured JSG Capital Investments with an aggregate limit of $35 million.  *Id.* Ex. F.  The third, titled

27  "How Your Money Is Protected," explained that investors were protected by the Securities Investor

28  Protection Corporation (SIPC).  *Id.* Ex. D.  Shortly after receiving Gill's email, a company team

member emailed the Fidelity statement and the "How Your Money Is Protected" piece to a prospective investor.  *See* Declaration of Michelle Chung in Support of TRO ("Chung Decl.") ¶ 4, Exs. A, C, and E.

Rios also lured investors through representations that JSG Capital Investments was a legitimate investment firm and that client money was secured.  For example, on February 15, 2016, Rios emailed a prospective investor answers to the "most frequently asked" questions, stating that Gill had "a career in Investment Banking with Morgan Stanley," that JSG Capital Investments was secured with insurance, that its "investment philosophy" included investments in the market and in "Pre-IPO companies," and that its "average trading profits range from $50k to $800k per day." Hawley Decl. ¶ 6, Ex. H.

## C.   Investors Enter Into Either the "Fixed Index" or "Pre-IPO" Agreement

Individuals who invested ultimately signed one of two types of contracts with Gill and JSG Capital LLC or JSG Capital Investments.  The first, called the "Fixed Index Investment Agreement" or some variant thereof, described the investment as an "Investment Note for the purchase of equities both long and short positions and Initial Public Offerings via the indices of the NYSE and NASDAQ – investing on behalf of [investor] thru JSG Capital Investments" or similar language.  *See* Chung Decl. ¶¶ 4-5, Exs. D at 1, G at 1; Declaration of Alla Karpuk in Support of TRO ("Karpuk Decl.") ¶ 4, Exs. A at 1, C at 1.  The individual investor agreed to pay a principal sum to either Jason Gill of JSG Capital LLC or JSG Capital Investments, the "Investee."  *Id.*  The investor was guaranteed a weekly or monthly payment of "interest (dividend)" of up to 60 percent annually from investment income achieved by JSG Capital Investments.  *Id.*  Upon completion of the contract term, JSG Capital Investments guaranteed repayment of the investor's initial investment, also referred to as the principal.  *See* Chung Decl. ¶¶ 4-5, Exs. D at 3, G at 3; Karpuk Decl. ¶ 4, Ex. C at 3.  The note, which purported to be secured by assets of JSG Capital LLC's accounts with Fidelity Investments and Morgan Stanley, stated that the investor's principal was covered by an insurance policy with Freedom Specialty Insurance or Nationwide Insurance, and also stated that, in the event of a loss, the investor would be eligible to file a claim at fsreportaloss@freedomspecialtyins.com.  *See* Chung Decl. ¶¶ 4-5,

Exs. D at 2, G at 2; Karpuk Decl. ¶ 4, Ex. C at 2.  The agreements were signed by Jason Gill – JSG Capital Investments LLC or Jason Gill – CEO/Principal, JSG Capital Investments LLC.  *See* Chung Decl. ¶¶ 4-5, Ex. D at 3, G at 3; Karpuk Decl. ¶ 4, Ex. C at 3.

The second type of contract was called a "Promissory Conversion Investment Note Agreement" or some variant thereof.  The contracts were characterized as a "Promissory Conversion Note" or "Promissory Note" for the purchase of stock and conversion to the investor of certain companies' Pre-IPO Private Placement Offerings or Initial Public Offering Stock by way of JSG Capital Investments or JSG Capital LLC.  *See* Hawley Decl. ¶ 6, Ex. G at 1; Johnston Decl. ¶¶ 5, 7, Exs. C at 1, F at 1; Karpuk Decl. ¶ 4, Ex. B at 1.[3]  Under the contract, Jason Gill of JSG Capital LLC or JSG Capital Investments acted as the "Investee" or "Borrower," borrowing a principal sum from the "Investor" or "Note Holder" and promising to pay it back.  *Id.*  The investor was allocated a certain number of "shares of [private company] stock (IPO) by way of JSG Capital LLC" or "JSG Capital Investments LLC."  *Id.*  The investor was also guaranteed monthly interest payments of up to 60 percent annually until the company had its purported IPO and the lockup period had expired.  *Id.*  JSG Capital Investments or JSG Capital LLC also guaranteed repayment of the initial investment by some identified date, sometimes contingent on the purported IPO being delayed.  Hawley Decl. ¶ 6, Ex. G at 3; Johnston Decl. ¶¶ 5, 7, Exs. C at 3, G at 3; Karpuk Decl. ¶ 4, Ex. B at 3.  The note purported to be secured by assets of JSG Capital LLC or by JSG Capital LLC's (or JSG Capital Investment LLC's) accounts with Fidelity Investments and Morgan Stanley.  Hawley Decl. ¶ 6, Ex. G at 3; Johnston Decl. ¶¶ 5, 7, Exs. C at 2, G at 2; Karpuk Decl. ¶ 4, Ex. B at 3.

Gill and JSG Capital LLC or JSG Capital Investments also represented in these "pre-IPO" agreements that the investor's principal investment was covered by a policy with Freedom Specialty Insurance or Nationwide Insurance under which, in the event of a loss, the investor would be eligible to file a claim.  Hawley Decl. ¶ 6, Ex. G at 3; Karpuk Decl. ¶ 4, Ex. B at 3.  The agreements were signed by Jason Gill – JSG Capital LLC, Jason Gill – Managing Director – JSG Capital Investments,

---

[3] The companies these contracts purport to sell shares of include the well-known private companies Alibaba, Uber, and Airbnb.

6

LLC, or Jason Gill – CEO/Principal, JSG Capital Investments, LLC.  Hawley Decl. ¶ 6, Ex. G at 3; Johnston Decl. ¶¶ 5, 7, Exs. C at 3, G at 3; Karpuk Decl. ¶ 4, Ex. B at 3.

### D.   Defendants' Representations to Investors Are False

As indicated below, all of these representations are false, made by defendants as part of their scheme to lure investors into a high return, supposedly safe investment.  In fact, defendants operate a Ponzi scheme through which they have to pay purported "returns" to keep the scheme going while they enrich themselves and other company insiders.

#### 1.   Gill and JSG's Claims to Industry Connections and Account Security Are False

Gill and JSG Capital Investments' claims about Gill's background, partnerships with venture capital firms, and the security of investors' funds are false.  Contrary to JSG Capital Investments' website and Gill's claims, Morgan Stanley has confirmed that Gill has never worked for them.  *See* Hawley Decl. ¶ 10, Ex. X.  Similarly, contrary to representations on the website, Sequoia Capital, Kleiner Perkins Caulfield & Byers, Benchmark Capital, and GGV Capital do not have and have never had a relationship with Gill or JSG Capital Investments.  *See id.* ¶¶ 11-14, Exs. Y at ¶¶ 6-7, Z at ¶ 5, AA at ¶ 5, BB at ¶¶ 5-6.[4]

Further, despite the claims of safety in the investments through purported insurance contracts, neither Nationwide nor Freedom Specialty has ever insured Gill, JSG Capital, LLC, or JSG Capital Investments.  *See* Hawley Decl. ¶ 15, Ex. CC at ¶ 5.  Nationwide never issued the policy Gill circulated, and the purported policy is thus a forgery.  *Id.* ¶ 15, Ex. CC at ¶¶ 6-8 & Ex. A thereto.  And JSG Capital Investments is not a member of SIPC.  *See id.* ¶ 9, Ex. W.

Furthermore, Morgan Stanley has no accounts with JSG Capital LLC or JSG Capital Investments.  *See id.* ¶ 17, Ex. EE at ¶ 5.  While JSG Capital Investments had a Fidelity account, the document Gill circulated is a fake.  The Fidelity account only had $8 in it as of November 30, 2015, not $32 million.  *See id.* ¶ 16, Ex. DD at ¶¶ 7-8 & Exs. A-B thereto.  Indeed, this account has never had more than $4,608.24 in it.  *See id.* ¶ 16, Ex. DD at ¶ 9.

---

[4] Indeed, the search by each of these companies only turned up a single document indicating that someone named Jason Gill "may have been employed by a company in which a fund managed by GGV invested."  *See* Hawley Decl. ¶ 14, Ex. BB at ¶ 6.

**2.    Defendants Do Not Invest In Stock or Sell "Pre-IPO"
Shares But Instead Operate a Classic Ponzi Scheme**

As discussed above, in their contracts, on the website, in the press release, and in direct solicitations, investors are told by defendants that their money is being used to either invest in the market or to buy shares of well-known private companies that defendants suggest are poised to become publicly traded in the near future.  These representations are false.  Instead, defendants used the investors' money to make Ponzi payments to existing investors and to pay Gill, Rios, and others affiliated with the company.

Bank records show that since September 2013, defendants operated a Ponzi scheme using 22 bank accounts opened in the names of corporate defendants JSG Capital Investments, LLC, JSG Capital, LLC, JSG Capital LLC, JSG Enterprises, LLC, and relief defendant JSG Management Group LLC.  *See* Declaration of John A. Roscigno In Support of TRO ("Roscigno Decl.") ¶ 3, Table 1. Investors transferred at least $9,986,561.12 into these 22 accounts, and $4,273,820.60 – almost 43 percent – of this amount was used in Ponzi fashion to make payments to existing investors.  *See* Roscigno Decl. ¶¶ 4, 6 and Table 2.

Nearly all of the money not transferred to existing investors was misappropriated by Gill and Rios.  Since September 2013, a total of $11,227,029.58 was deposited into the 22 bank accounts opened for the JSG corporate entities.  *Id.* ¶¶ 4, 6-7 and Table 2.[5]  Of that amount, more than $6.1 million was used to make payments for the benefit of company insiders.  *Id.* ¶¶ 4, 9 and Table 2.[6]

Of the $6.1 million in payments to insiders, over $1.7 million was transferred to or withdrawn in cash by Rios, and $289,131 was transferred to or withdrawn in cash by Gill.  *See id.* ¶ 9, Table 3. Gill took another $115,400 to pay for rent and improvements for his personal residences, as well as an additional $790,871 through a prepaid expense card ("Pex") that Gill used for personal

---

[5] Of this amount, $9,986,561.12 came from investors and $1,240,468.46 came from sources that could not be identified from bank records.  *See id.* ¶¶ 4, 6-7 and Table 2.  Indeed, $749,113 of the $1,240,468.46 came from cash deposits.  *Id.* ¶ 7.

[6] Those insiders include 1) any signatories of the JSG entity bank accounts, 2) holders of a brokerage account into which funds from the JSG entities' bank accounts were transferred, 3) three company employees, and 4) anyone who either received significant amounts of money from the company without putting any into it, or who invested a small amount and received several times that amount back.  *See id.* ¶¶ 4, 9 and Table 2.

expenditures such as hotels including the St. Regis, Cosmopolitan, and Four Seasons; restaurants and night clubs; and lavish purchases at Cartier, Neiman Marcus, and Tiffany.  *See id.* ¶¶ 4, 10 and Table 2.  On top of all this, Gill and Rios misappropriated an additional $590,427 to pay for meals/entertainment, credit cards, ATM withdrawals, retailers, and lodging.  *See id.* ¶ 11.  None of the documents provided to investors disclosed and/or authorized the use of investor funds for these purposes.

Defendants Gill, Rios, JSG Capital LLC, and JSG Capital Investments used very little of the money they collected from investors to invest in the stock market or businesses, contrary to their promises.  Of the over $11.2 million that went into the 22 JSG entity bank accounts, just under $100,000 was transferred into brokerage accounts belonging to JSG corporate entities.  *See* Roscigno Decl. ¶¶ 4, 15-16 and Tables 2 and 6.[7]  An additional $744,600 was transferred into personal brokerage accounts belonging to insiders like Gill, Rios and others.  *See id.* ¶¶ 4, 12, 15-16 and Tables 2, 4 and 6.[8]  Altogether, about half of the money put in the corporate entities' and insiders' private brokerage accounts was lost.  *See id.* ¶¶ 15-16 and Table 6.

Similarly, defendants Gill, JSG Capital LLC, and JSG Capital Investments never acquired the so called "pre-IPO" shares of private companies such as Alibaba, Uber, or Airbnb that they agreed to allocate to investors.  Gill and JSG Capital Investments purported to buy these shares through Morgan Stanley and partnerships with venture capital firms.  For example, JSG Capital Investments' "Investor Relations Information Sheet" stated that the company purchased such shares through venture capital firms.  *See* Chung Decl. ¶4, Exs. A, B at 2 ("JSG Capital Investments is occasionally provided an offering of shares at Pre-IPO prices via Venture Capital firms such as Benchmark Capital, Sequoia Capital or Kleiner Perkins").  Gill made this same representation to investors.  For example, Gill told one investor that he was acquiring shares of Alibaba through Morgan Stanley, and another that she was acquiring shares in Uber.  *See supra* at 4; Hawley Decl. ¶ 6, Ex. G.  These pre-

---

[7] The approximate $100,000 was transferred from bank accounts belonging to JSG Capital LLC and JSG Enterprises, LLC to brokerage accounts belonging to JSG Capital LLC and JSG Enterprises, LLC.  *See* Roscigno Decl. ¶¶ 4, 15-16 and Tables 2 and 6.

[8] Gill or Rios were signatories on the JSG entity bank accounts from which $726,100 of this $744,600 was transferred.  *See* Roscigno Decl. ¶¶ 15-16 and Table 6.

1   IPO shares were supposedly "held in escrow at partnering VC firms."  Chung Decl. ¶ 4, Ex. B at 2.

2   These statements were false.  There is no evidence in any of the 22 JSG entity bank account records

3   reflecting payments to Morgan Stanley, Benchmark Capital, Sequoia Capital, Kleiner Perkins, or

4   GGV Capital.  *See* Roscigno Decl. ¶ 28.  This makes sense, as neither JSG Capital LLC nor JSG

5   Capital Investments has any accounts at Morgan Stanley, and the other entities do not have and have

6   never had a relationship with Gill or JSG Capital Investments.  *See supra* at 7.

7        Tracing individual investor funds shows the same results.  One investor's $50,000 investment

8   in purported Alibaba pre-IPO shares was not used to pay Morgan Stanley for such shares or for any

9   other purpose.  *See* Roscigno Decl. ¶ 29.  Instead, $25,000 of it was withdrawn by an insider, and the

10  other half was put into a Fidelity brokerage account, where it was used to trade in seven companies

11  that were *not* Alibaba.  *Id*.  This trading resulted in the loss of $8,792, and the majority of what was

12  not lost was returned to two JSG Capital LLC bank accounts and commingled with the funds in those

13  accounts.  *Id*.  Similarly, another investor's $25,000 investment in purported Uber pre-IPO shares

14  was not used to purchase such shares – or for anything else – from any of the venture capital firms.

15  *Id*. ¶ 30.  Instead, $10,000 of her investment was transferred to an insider, $9,330 went to 16 pre-

16  existing investors, and $2,500 went to Gill's Pex card.  *Id*.

17       As indicated below, defendants' scheme continues – the website is still up, and the most

18  recent bank records indicate that money is still coming in from investors and being used to pay prior

19  investors and insiders.  *See infra* at 22.

20  **III.   ARGUMENT**

21       **A.   Standard For Injunctive Relief In SEC Enforcement Actions**

22       In seeking injunctive relief, the SEC appears before the Court "not as an ordinary litigant, but

23  as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws."

24  *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975).  Thus, "[u]nlike private actions,

25  which are rooted wholly in the equity jurisdiction of the federal court, SEC suits for injunctions are

26  'creatures of statute,'" brought under federal securities laws that establish a more lenient standard

27  than those applicable to private civil litigants.  *Id*.  Specifically, Section 20(b) of the Securities Act of

28  1933 ("Securities Act") and Section 21(d)(1) of the Exchange Act of 1934 ("Exchange Act") provide

that "[w]henever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute . . . a violation of [federal securities laws]," the SEC "may . . . bring an action in [the] district court of the United States . . . to enjoin such acts or practices, and upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond."  15 U.S.C. §§ 77t(b), 78u(d).[9]  A "proper showing" warranting an injunction is established by demonstrating "(1) a *prima facie* case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated."  *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1196, 1199 n.2 (11th Cir. 1999).  This standard has been adopted by numerous district courts in the Ninth Circuit.  *See, e.g.*, *SEC v. Capital Cove Bancorp, LLC*, 2015 WL 9704076 at *6 (C.D. Cal. Sept. 1, 2015); *SEC v. Pac. West Capital Grp., Inc.*, 2015 WL 9694808, at *4 (C.D. Cal. June 6, 2015); *SEC v. Schooler*, 902 F. Supp. 2d 1341, 1344-45 (S.D. Cal. 2012); *SEC v. Homestead Props., L.P.*, 2009 WL 5173685, at *2 (C.D. Cal. Dec. 8, 2009); *SEC v. Credit First Fund, LP*, 2006 WL 4729240, at *14 (C.D. Cal. Feb. 13, 2006).[10]

### B.   The SEC Has Made a *Prima Facie* Showing That Defendants Are Violating Federal Securities Laws

The record establishes a *prima facie* case that the defendants are violating the antifraud provisions of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Section 17(a) prohibits fraud in the offer or sale of securities, and Section 10(b) and Rule 10b-5 prohibit fraud in connection with the purchase or sale of any security.  *See* 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855 (9th Cir. 2001).  Defendants have violated both provisions.

---

[9] Section 209(d) of the Investment Advisers Act of 1940 likewise grants the Commission authority to bring an action to enjoin violations of that act and provides that, upon a "showing," a "permanent or temporary injunction or decree or restraining order shall be granted without bond."  15 U.S.C. § 80b-9(d).

[10] The Ninth Circuit has never addressed the applicability of the *Unique Financial Concepts* test. However, consistent with the above authority, the Ninth Circuit has acknowledged that when shown by the SEC, a "*prima facie* case of the probable existence of fraud and mismanagement . . . is sufficient to call into play the equitable powers of the court."  *SEC v. United Fin. Grp., Inc.*, 474 F.2d 354, 358 (9th Cir. 1973).

### 1. Defendants' Pre-IPO Promissory Notes and Fixed Index Agreements That Were Sold to Investors Are Securities

As discussed above, defendants did invest at least some investor funds (albeit a significantly small portion) in securities. *See* Section II.D.2, *supra*. In addition, both the "Fixed Index Investment Agreements" and the "Promissory Conversion Investment Note Agreements" themselves constitute "securities" under Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 77c(a)(10). First, the agreements meet the test for "investment contracts" that qualify as securities set forth by the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 295 (1946). Second, the contracts meet the test for "notes" that constitute securities provided by the Supreme Court in *Reves v. Ernst & Young*, 494 U.S. 56, 64 (1990). In addition, defendants took investors' money by promising that it would be invested in securities. *See SEC v. Zandford*, 535 U.S. 813, 820 (2002) ("a broker who accepts payment for securities that he never intends to deliver, or who sells customer securities with intent to misappropriate the proceeds, violates § 10(b) and Rule 10b-5").

Under *Howey*, an "investment contract" is (1) an investment of money; (2) in a common enterprise; (3) with an expectation of profits produced from the efforts of others. 328 U.S. at 301.[11] First, the "investment of money" element is met when an investor "commit[s] his assets to the enterprise in such a manner as to subject himself to financial loss." *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003) (quotation and citations omitted); *see also Warfield v. Alaniz*, 569 F.3d 1015, 1023 (9th Cir. 2009) ("In sum, because under the terms of the [contract], the [investors] committed their assets in return for promised financial gain, the transactions involved satisfy the 'investment of money' prong"). Here, investors "committed their assets" by providing money to Gill, JSG Capital LLC, or JSG Capital Investments in return for a promised financial gain of so-called interest payments. Investors signing the supposed pre-IPO contracts were also told that they would receive shares of a particular company's stock. Each investor was "subject[ed] . . . to financial loss" because

---

[11] *But see In re Barkate*, 57 S.E.C. 488, 495 n.13, 2004 SEC LEXIS 806, **495 n.13 (April 8, 2004) (Commission Opinion) (noting Commission's position that a "common enterprise" is not "a distinct requirement for an investment contract under *Howey*").

1  each "incurred a risk" that their individual investment "would not return a profit, or that the enterprise

2  as a whole would fail." *Rubera*, 350 F.3d at 1090.[12]

3       Second, a "common enterprise" is "either an enterprise common to an investor and the seller,

4  promoter, or some third party (vertical commonality) or an enterprise common to a group of investors

5  (horizontal commonality)." *SEC v. R.G. Reynolds Enters., Inc*., 952 F.2d 1125, 1130 (9th Cir. 1991)

6  (citation omitted).  Pooling of investors' funds establishes horizontal commonality.  *Id*. at 1134.

7  Here, investors' funds were commonly wired to a single bank account, where they were pooled to

8  make Ponzi payments and otherwise misappropriated.  *See* Roscigno Decl. ¶¶ 3-6, 9-11 and Tables 1,

9  2, and 3.  Vertical commonality is also present.  "Vertical commonality may be established by

10  showing that the fortunes of the investors are linked with those of the promoters." *R.G. Reynolds*, 952

11  F.2d at 1130 (citation and internal quotations omitted).  Both types of contract guaranteed interest of

12  up to 60 percent annually.  *See supra* at 5-6.  Gill's, JSG Capital LLC's, or JSG Capital Investments'

13  ability to pay such large returns was necessarily tied to the success of their purported investments in

14  the stock market.  As to the pre-IPO investment, Gill told at least one investor that the pre-IPO stock

15  the investor was purchasing was part of a larger portion of the same stock that had been allocated to

16  his company (*see supra* at 4), linking the investor's "fortunes" in the pre-IPO stock with those of Gill,

17  JSG Capital LLC, and JSG Capital Investments.

18       Finally, the third *Howey* prong, "an expectation of profits produced from the efforts of

19  others," is met.  Even a fixed rate of return, like the "interest" promised here, constitutes a "profit."

20  *See SEC v. Edwards*, 540 U.S. 389, 394-396 (2004) (*Howey* test satisfied despite fact that scheme

21  promised fixed rather than variable rate of return); *Warfield*, 569 F.3d at 1023-24 (fixed periodic

22  payments may constitute "profits" for purposes of *Howey* test).  And the "profits" here were to be

23

24  _____

[12] In fact, the investors were still "subject[ed] . . . to financial loss" even though both types of
25  contracts guaranteed a specific rate of return, stated that the investments were insured, and (at least as
to the "fixed index" contract), promised to return the "principal" investment, because there was no
26  guarantee that JSG Capital LLC, JSG Capital Investments, or the purported insurance company
would be financially able to honor these contractual obligations.  *See Rubera*, 350 F.3d at 1090 (first
27  element satisfied even though investors had option to resell investments back to company at purchase
price for indefinite period, because there was no guarantee that company would be financially able to
28  honor the buyback requests at the time investors demanded them).

1   "produced from the efforts of others" because the investors were not running the business and were

2   dependent on the efforts of Gill and other company employees for their returns.  *See Rubera*, 350

3   F.3d at 1092 (third prong present where "entire scheme hinged on [company's] efforts, managerial

4   skill, and – as became evident at the time of [company's] demise – continued solvency"); *R.G.*

5   *Reynolds*, 952 F.2d at 1131(third prong met when "the efforts made by those other than the investor

6   are the undeniably significant ones, those essential managerial efforts which affect the failure or

7   success of the enterprise") (quotation and citations omitted).  Finally, the fact that the return was

8   purportedly insured does not preclude it from being a profit produced from the efforts of others.  *See*

9   *United States v. Carman*, 577 F.2d 556, 563-64 (9th Cir. 1978) (rejecting defendant's contention that

10  investors' profits did not depend on his efforts because their returns were guaranteed by federal

11  government, where agreements placed investors in totally passive role and investors' avoidance of

12  loss was clearly dependent on sound management and continued solvency of defendant's business).[13]

13        **2.**      **Defendants Engaged in a Scheme to Defraud in Violation of Section 10(b)**
14             **and Rules 10b-5(a) and (c) of the Exchange Act, and Sections 17(a)(1) and**
           **17(a)(3) of the Securities Act**

15        Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder prohibit employing

16  any scheme to defraud or engaging in any course of business to defraud in connection with the

17  purchase or sale of securities.  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a), (c).  Sections 17(a)(1)

18  and 17(a)(3) of the Securities Act prohibit the same conduct in the offer or sale of any securities.  15

19  U.S.C. §§ 77q(a)(1), (a)(3).  To be liable for a scheme to defraud, a defendant "must have engaged in

20  conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance

21  of the scheme."  *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006) (*vacated on*

22  *other grounds sub nom.*); *see also SEC v. Sells*, 2012 WL 3242551, at *7 (N.D. Cal. Aug. 10, 2012).

23

24  [13] In addition to being "investment contracts," both types of agreements are also "notes" that qualify
25  as securities.  As indicated above, both types of contracts were structured as notes.  *See supra* at 5-6.
    The Supreme Court in *Reves* held that all notes are presumed to be securities, and that presumption
26  can only be rebutted by a showing that the note bears a strong resemblance to one of the judicially
    created types of notes that are not securities, such as those related to mortgages, consumer financing,
27  and accounts receivables.  494 U.S. at 62-63.  The type of notes issued here are clearly the type that
    constitute "securities," and application of the factors identified by the Supreme Court in *Reves* fails to
28  rebut that presumption.  *Id.* at 67.

1     Scheme liability claims under Section 10(b) and Rule 10b-5 and Section 17(a)(1) require

2 proof of scienter – a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst &*

3 *Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).[14]  Recklessness satisfies the scienter

4 requirement.  *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (scienter

5 demonstrated where a defendant acts recklessly, engaging in misconduct that is "so obvious that the

6 actor must have been aware of it").  Scienter may also be inferred from circumstantial evidence

7 suggesting an obvious risk of misleading investors that is so great that it is simply implausible that

8 defendant did not know about it.  *See Vernazza v. SEC,* 327 F.3d 851, 860–61 & n. 8 (9th Cir. 2003);

9 *In re Software Toolworks Inc.*, 50 F.3d 615, 627 (9th Cir. 1994).  The scienter of senior officers may

10 be imputed to the corporate entity.  *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d

11 651, 688 (6th Cir. 2005); *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972).

12     Defendants engaged in a scheme to create the false appearance that JSG Capital Investments

13 was a low-risk, legitimate investment firm that used investors' money to purchase stock or pre-IPO

14 securities.  This conduct was done in furtherance of defendants' efforts to misappropriate large sums

15 of investors' funds and run a Ponzi scheme.  Courts find Ponzi schemes to be intrinsically fraudulent,

16 such that they violate Section 10(b) and Rule 10b-5 of the Exchange Act and Sections 17(a)(1) and

17 (3) of the Securities Act.  *See In re United Energy Corp.*, 944 F.2d 589, 590 n.1 (9th Cir. 1991) ("[a]

18 Ponzi scheme is a fraudulent arrangement in which an entity makes payments to investors from

19 monies obtained from later investors rather than from any 'profits' of the underlying business

20 venture"); *see also SEC v. Loomis*, 969 F. Supp. 2d 1226, 1237 (E.D. Cal. 2013) (acceptance of new

21 investor money to make payments to existing investors constituted "deceptive conduct" that "went

22 beyond mere misrepresentations").

23     Defendants engaged in the following conduct that had the principal purpose and effect of

24 creating the façade that JSG Capital Investments was a legitimate investment firm in furtherance of

25 their scheme to defraud:

26

27 _____

28 [14] However, scienter is not required to prove violations of Sections 17(a)(2) or (3) of the Securities
Act – negligence is sufficient.  *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980).

- JSG Capital Investments made false statements on its website claiming that (1) the company makes money by investing in stocks and businesses; (2) Gill worked for Morgan Stanley where he participated in a number of specific IPOs; and (3) Gill and the company have business partnerships with many specific venture capital firms. *See supra* at 2-3, 7. Gill perpetuates these false statements by attaching a link to the website in his email signature block. *See* Hawley Decl. ¶¶ 3, 5 & Exs. A and C.

- JSG Capital Investments issued a press release in furtherance of its claim that the company invests in stocks and businesses to achieve its returns. *See supra* at 3-4.

- Gill encouraged his team to close clients by using a forged Fidelity account statement, a forged Nationwide policy, and a false document promising that investors were secured by SIPC. *See supra* at 4-5, 7.

- Gill, JSG Capital LLC, and JSG Capital Investments falsely told investors in the fixed index and pre-IPO contracts that (1) investor funds would be used to purchase stock or that investors would be allocated pre-IPO shares; (2) investors' money was insured; and (3) the company's assets were secured by Fidelity and Morgan Stanley. *See supra* at 5-7. Gill, Rios, and other JSG team members then presented these contracts to individuals who gave defendants their money.

- Gill and Rios then executed account transactions in each of the corporate entities' accounts under their control to use investors' funds to make Ponzi payments to existing investors and to misappropriate funds to insiders, including themselves. *See supra* at 8-10.

The evidence also establishes that Gill and Rios acted with scienter by carrying out the Ponzi scheme described above. They were listed as account signatories for 17 of the 22 JSG entity bank accounts. Roscigno Decl. ¶ 3, Table 1.[15] Gill and Rios were the sole signatories for 13 of these 17 accounts, and thus directed, or at a minimum had knowledge of and permitted, the transactions at least as to these 13 accounts. In fact, Gill and Rios were the signatories on the two largest accounts. *Id.*¶¶ 3-5 and Tables 1-2. Large sums of investor funds were deposited directly into these two accounts and were then withdrawn to pay prior investors and misappropriated for Gill's and Rios' personal use. *See id.* ¶¶ 3-6, 9-11 and Tables 1, 2, and 3. Gill and Rios knew, or were reckless in not knowing, about the misappropriation of huge sums of investor funds from at least these two largest accounts.

Analysis of individual account activity over specified periods of time likewise suggests that Gill and Rios operated the scheme and did so deliberately. For example, on June 9, 2015, the JSG Capital Investments BBVA account ending in 7924 had a beginning balance of $351. Roscigno Decl. ¶ 25, Table 9 and Exs. 25-26. Rios is the only signatory on this account. *Id.* ¶ 3, Table 1. Between June 9, 2015 and June 19, 2015, $281,010 of investor funds was deposited into this account, and

---

[15] The signatories for the remaining five accounts were company insiders. *See* Roscigno Decl. ¶¶ 3, 9 and Tables 1 and 3.

$278,459 was withdrawn, leaving a balance of $2,902. *Id.* ¶ 25, Table 9 and Exs. 25-26. The

withdrawals included $150,000 to pay Rios, $66,815 to pay existing investors, $40,000 for a Pex

card, and additional smaller payments for transportation, retail, and bank fees. *Id.* Additional

examples showing Ponzi transfers in accounts are provided in the attached Declaration of John

Roscigno. *See* Roscigno Decl. ¶¶ 21-24, 26-27, Tables 7-8, 10-11 and Exs. 20-24, 27-30.

Similarly, Gill and Rios knew, or were reckless in not knowing the falsity of the statements

that investors' funds would be used to purchase stock or shares of private companies, as reflected in

the investment contracts, the company's website, the company's press release, and emails to

individual investors. They controlled the JSG entities' bank accounts and knew, or were reckless in

not knowing, that the money deposited by investors in those accounts was being withdrawn to pay

prior investors and misappropriated to company insiders. Furthermore, Gill's and Rios' scienter is

imputed to the entity defendants, as they were officers and persons who controlled those entities,

including the entities' bank accounts.[16] *See Hollinger,* 914 F.2d at 1578 (respondeat superior gives

rise to entity liability in securities cases); *In re Cylink Sec. Litig.,* 178 F. Supp. 2d 1077, 1088 (N.D.

Cal. 2001) (describing Ninth Circuit authority holding entities vicariously liable for securities fraud

by officers).

### 3.   Gill, Rios, JSG Capital LLC, JSG Capital, LLC and JSG Capital Investments Made Materially False and Misleading Statements in Violation of Section 10(b) and Rule 10b-5(b) of the Exchange Act, and Section 17(a)(2) of the Securities Act

Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder prohibit the making of any

untrue statement of material fact in connection with the purchase or sale of a security. 15 U.S.C.

§ 78j(b); 17 C.F.R. § 240.10b-5(b). Section 17(a)(2) of the Securities Act likewise prohibits any

person from obtaining money or property in the offer or sale of any security by means of any untrue

statement of material fact or any omission of a material fact. 15 U.S.C. § 77q(a)(2). Information is

---

[16] Gill is the CEO of JSG Capital Investments. *See* Hawley Decl. ¶¶ 3, 8, Exs. A, V. JSG Capital, LLC was registered with the California Secretary of State in 2010 with Gill as the "organizer" and CEO. *Id.* ¶7, Ex. K. JSG Capital Investments was registered in 2014 with Rios listed as one of two members. *Id.* Ex. L. JSG Capital LLC was registered in 2015 with Gill as the only member. *Id.* Ex. M. Bank records show that Gill is the President of JSG Enterprises LLC. Roscigno Decl. ¶ 3, Ex. 8 at 4. And JSG Management Group LLC was registered in 2015 with Rios as the only member. Hawley Decl. ¶ 7, Ex. N.

1   "material" if there is a substantial likelihood that a reasonable investor would consider it important in

2   making an investment decision. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).  Under Section

3   10(b) of the Exchange Act and Rule 10b-5(b), a person is liable as the "maker" of a misleading or

4   false statement if that person has "ultimate authority over the statement, including its content and

5   whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S.

6   135, 142 (2011).  When they made written statements to investors, or authorized statements, Gill,

7   Rios, JSG Capital LLC, and JSG Capital Investments became the "makers" of those statements.  *See*

8   *Id.*

9          Defendants Gill, Rios, JSG Capital LLC, and JSG Capital Investments made numerous

10  material misrepresentations and omissions of fact in violation of these provisions, including the

11  following:

12  • Gill, JSG Capital LLC, and JSG Capital Investments made untrue statements of
    material fact in contracts with investors, including that (1) investor funds would be
13  used to purchase stock or that investors would be allocated pre-IPO shares; (2)
    investors' money was insured; and (3) the company's assets were secured by Fidelity
14  and Morgan Stanley.  *See supra* at 5-7.  All three were parties to contracts with
    investors.  *See id.*

15  • Gill made untrue statements of material fact in writing to at least one investor that Gill
    was previously employed by Morgan Stanley, and that Gill's firm had been allocated
16  pre-IPO Alibaba shares that were available for purchase, ultimately leading the
    investor to give Gill his money to acquire these purported shares.  *See supra* at 4.  The
17  investor's money was not used to allocate shares of this stock and instead, as with the
    other investors, went into the Ponzi scheme described above.  *See* Roscigno Decl.
18  ¶ 29; Johnston Decl. ¶ 8.

19  • Rios convinced another investor to invest by sending her an email that contained false
    statements that the company invested in the market and pre-IPO companies, and a
20  false statement that the company's trading profits were $50,000 to $800,000 per day.
    *See supra* at 5.

21  • JSG Capital Investments convinced investors to give it money by making false
    statements on its website that (1) the company makes money by investing in stocks
22  and businesses; (2) Gill worked for Morgan Stanley where he participated in IPOs;
    and (3) Gill and the company have business partnerships with many specific venture
23  capital firms.  *See supra* at 2-4, 7.

24         All of these misrepresentations were "material" and made with the requisite scienter.  First,

25  the statements were material, as any reasonable investor would consider it important that his or her

26  money was not going to be invested in stock or used to purchase pre-IPO shares, but instead would be

27  used in a Ponzi scheme to pay prior investors and misappropriated by Gill and Rios to pay their

28  personal expenses.  Courts routinely find that both lies about and the perpetuation of a Ponzi scheme

1    are material.  *See, e.g., SEC v. Better Life Club of Am., Inc.*, 995 F. Supp. 167, 177 (D.D.C. 1998)

2    ("[I]t is more than reasonable to assume that prospective investors would have shied away had they

3    known that the Advertising Pool was a pyramid scheme").  Similarly, defendants' misappropriation

4    of investor funds for their own use is information a reasonable investor would want to know, as were

5    Gill's and JSG Capital Investments' misrepresentations about partnering with well-known venture

6    capital firms in Silicon Valley.  *See, e.g., SEC v. U.S. Sustainable Energy Corp.*, 2011 WL 2980549,

7    at *8 (S.D. Miss. July 21, 2011) (falsehoods about the engagement of a prominent investment banker

8    materially altered the total mix of information available to the reasonable investor).  Reasonable

9    investors would likewise consider it important that their investment was not insured, and that the firm

10   did not have significant assets in accounts with large brokerage firms.

11       Second, the misrepresentations were made with scienter, as Gill and Rios also knew, or were

12   reckless in not knowing, the falsity of the representations they made to individual investors.  Gill, for

13   example, knew that the statements in the investment contracts he signed with these and all other

14   investors were false.  He controlled many of the bank accounts, and thus knew that investor funds

15   were not used to purchase stock or pre-IPO shares.  As CEO of the company, Gill knew or was

16   reckless in not knowing there were no policies insuring investors' money, and that the company's

17   assets were in fact not secured by assets at Fidelity and Morgan Stanley.  Gill knew that he had never

18   worked in investment banking with Morgan Stanley, but told investors that anyway.  Similarly, he

19   knew or was reckless in not knowing that the Fidelity account and Nationwide policy he circulated to

20   his team to help "close" clients were forged documents.[17]  Finally, at a minimum, Rios knew or was

21   reckless in not knowing the falsity of his statement in his February 16, 2016 email to an investor that

22   the company's trading profits were $50,000 to $800,000 per day.  *See supra* at 5.  Rios was the

23   signatory on, and therefore had control over or at a minimum knowledge of, the transactions in the

---

[17] The fake Fidelity account was set up using Gill's home address.  *See* Hawley Decl. ¶ 5; Roscigno Decl. ¶ 16, Ex. 31.  Gill knew, or was reckless in not knowing, that the purported $32 million balance on the fake Fidelity account statement grossly overstated JSG Capital Investments' assets.  Gill was the account signatory on many of the bank accounts through which the Ponzi scheme was run.  *See* Roscigno Decl. ¶ 3, Table 1.  The total amount deposited in all of the JSG entities' bank accounts over a period of almost three years was $11.2 million.  *See id.* ¶ 4, Table 2.  Indeed, the total in all these bank accounts at any given time would have been far less than $11.2 million, because money was continually withdrawn to pay existing investors and insiders.  *See generally id.*

bank accounts into which investor funds were being deposited and withdrawn for months prior to and after he sent this email.  *See* Roscigno Decl. ¶ 3, Table 1.  He thus knew or was reckless in not knowing that the company had nowhere near this level of trading profits and that nearly all investor funds were being allocated in Ponzi fashion to pay prior investors and were misappropriated.

### 4. JSG Capital Investments and Gill Violated the Antifraud Provisions of the Advisers Act

Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act") make it unlawful for an investment adviser to employ any device, scheme, or artifice to defraud clients or prospective clients or to engage in any transaction, practice, or course of business that defrauds clients or prospective clients.  15 U.S.C. § 80(b)-6(a)(1)-(2).  Claims under Section 206(1) require proof of scienter.  *See SEC v. Steadman*, 967 F.2d 636, 641 (D.C. Cir. 1992).[18]  An "investment adviser" is defined under the Act as any "person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities."  15 U.S.C. § 80b-2(a)(11).  An investment adviser is a fiduciary, and thus has an affirmative obligation of utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading clients.  *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963).

JSG Capital Investments and Gill were both "investment advisers."  JSG Capital Investments' website is filled with advice on the profitability of investing in the fixed income and pre-IPO securities it offers.  *See supra* at 2-3.  The company described itself as an "Investment Advisory firm" in the "Investor Relations Information Sheet" prepared for investors.  *See* Chung Decl. ¶ 4, Ex. B. The company received "compensation" for this advice, as it maintained bank accounts into which investor proceeds were deposited and received an economic benefit in the form of misappropriated investor funds.  *See* Roscigno Decl. ¶¶ 3-11 and Tables 1-3.  *See SEC v. Morriss*, 2012 WL 6822346, at \*12 (E.D. Mo. Sept. 21, 2012) (SEC sufficiently pleaded "compensation" element by alleging misappropriation of investor funds)*; cf. U.S. v. Elliott*, 62 F.3d 1304, 3011 (11th Cir. 1996)

---

[18] Claims under Section 206(2) do not require proof of scienter.  *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963).

1  (defendant received compensation for investment advice where defendant commingled investors

2  funds with personal funds).  Gill likewise engaged in the business of advising others on purchasing

3  pre-IPO stock, making personal solicitations to that end and even issuing statements in a press release

4  about the incredible investment opportunities offered by his company.  *See supra* at 3-4.  He also

5  signed investment contracts that guaranteed returns.  *See supra* at 5-6.  Gill received "compensation"

6  for this advice, as he opened numerous bank accounts into which investor proceeds were deposited

7  and then misappropriated large sums of these proceeds for his personal use (*see supra* at 8-10).  *See*

8  *Morriss*, 2012 WL 6822346, at *12*; *cf. U.S. v. Elliott*, 62 F.3d at 3011.

9      Each violated Sections 206(1) and 206(2) of the Advisers Act by engaging in the scheme and

10  course of business to defraud investors described above, misleading investors into thinking their

11  money was used for stock purchases when in reality it was used to pay existing investors and was

12  misappropriated by Gill and Rios.  Each also violated Sections 206(1) and 206(2) by making false

13  statements about Gill's background, as well as false statements about their connections to, and

14  partnerships with, venture capital firms.  As described above, they did so knowingly, and their

15  misrepresentations and fraudulent conduct involved facts that would be "material" to any investor.

16      **C.      Defendants' Violations Will Likely be Repeated**

17      Whether a likelihood of future violations exists depends upon the totality of the

18  circumstances.  *See SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980); *SEC v. Fehn*, 97 F.3d 1276,

19  1295-96 (9th Cir. 1996).  The existence of past violations may give rise to an inference that there will

20  be future violations.  *See Murphy*, 626 F.2d at 655; *United Fin. Grp., Inc.*, 474 F.2d at 358-59; *see*

21  *also U.S. v. Odessa Union Warehouse Co-Op*, 833 F.2d 172, 176 (9th Cir. 1987).  Courts also

22  consider factors such as the degree of scienter involved, the isolated or recurrent nature of the

23  violative conduct, the defendant's recognition of the wrongful nature of the conduct, the likelihood

24  that, because of the defendant's occupation, future violations may occur, and the sincerity of

25  defendant's assurances (if any) against future violations.  *See Murphy*, 626 F.2d at 655.

26      Defendants' securities laws violations will continue in the absence of a TRO and preliminary

27  injunction.  Defendants have engaged in a deliberate, recurrent scheme to defraud investors for

28  almost three years, pretending to operate an investment firm that is in reality a front used to acquire

1  and misappropriate money from investors that is then paid in Ponzi payments to prior investors.

2  Defendants' misconduct is ongoing.  JSG Capital Investments' website is still up.  *See* Hawley Decl.

3  ¶ 8.  Money continues to flow in from investors and out to prior investors and insiders.  Between

4  March 1, 2016 and May 6, 2016, almost $2.5 million of investor money was transferred into the JSG

5  entities' bank accounts; $1 million of this was used to pay prior investors, and $1.4 million was

6  misappropriated.  *See* Roscigno Decl. ¶¶ 31-33, Table 12.  Indeed, for the latest week of bank records

7  available, covering May 2 to May 6, $144,890 came in from investors and another $8,500 was

8  deposited in cash; of which $60,685 was used to pay prior investors, $20,200 inappropriately sent to

9  insiders, and $4,173 to make other miscellaneous payments.  *Id.* ¶ 33.

10      An order prohibiting defendants from violating the antifraud provisions of the securities laws

11  is necessary to deter defendants from continuing with their fraud, as a violation of such an order may

12  be met with contempt sanctions.  *See, e.g., Hicks ex rel. Feiock v. Feiock,* 485 U.S. 624, 627 (1988)

13  (contempt of Court's order shown by existence of a valid order, defendant's knowledge of the order,

14  and defendant's failure to comply with the order).  Courts may fashion temporary restraining orders

15  or preliminary injunctions to enjoin a defendant from further violations of law, or prohibit his specific

16  actions with regard to management of securities.  *See, e.g., SEC v. Trabulse*, 526 F. Supp. 2d 1008,

17  1017-18 (N.D. Cal. 2007) (prohibiting hedge fund manager from further violations of specific

18  provisions of law, and from withdrawing any money pursuant to his advisory agreement prior to

19  completing an accounting); *SEC v. eAdGear, Inc.*, 2014 U.S. Dist. LEXIS 170159, at *8-9 (N.D. Cal.

20  Dec. 8, 2014) (issuing preliminary injunction against offer and sales of certain types of securities).

21  Defendants' fraudulent scheme is premised upon their continuing to raise investor money that they

22  then pay to prior investors and misappropriate.  Halting this scheme in its tracks requires having the

23  Court impose a temporary order that prohibits them from directly or indirectly soliciting any person

24  to purchase or sell any security.

25      **D.**      **The Asset Freezes and Discovery Orders Are Necessary**

26          **1.**      **Asset Freezes Are Appropriate and Necessary**

27      In addition to a restraining order, the SEC also seeks an asset freeze, which is well justified

28  here.  Federal courts have "inherent equitable power to issue provisional remedies ancillary to its

authority to provide final equitable relief." *Reebok Int'l, Ltd v. Marnatech Enters., Inc.*, 970 F.2d 552, 559 (9th Cir. 1992); *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980).  These powers include the authority to freeze assets of both parties and nonparties.  *See SEC v. Hickey*, 322 F.3d 1123, 1131 (9th Cir. 2003); *SEC v. Int'l Swiss Invs. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990).  The purpose of a freeze order is to prevent the dissipation of assets so that they may be available to be paid as disgorgement for the benefit of victims of the fraud.  *See, e.g.*, *Hickey*, 322 F.3d at 1132 (affirming asset freeze over nonparty brokerage firm controlled by defendant to effectuate disgorgement order against defendant); *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1105-06 (2d Cir. 1972).

"A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages if relief is not granted." *Johnston v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009).  Courts consider a defendant's prior unlawful acts and the location of the assets in considering whether an asset freeze is warranted.  *See, e.g.*, *id*. at 1085; *Manor Nursing*, 458 F.2d at 1106 ("uncertainty existed with respect to the total amount of proceeds received and their location," thus asset freeze was warranted).

It is likely that defendants will continue to dissipate new investors' funds unless defendants' assets are frozen.  As indicated above, defendants' Ponzi scheme is still active.  There is an ongoing threat that defendants will continue to misappropriate and dissipate funds from investors, and an asset freeze would prevent such losses.

These circumstances further suggest that the SEC would face an "inability to recover" monetarily absent an asset freeze.  *Johnston*, 572 F.3d at 1085.  Courts have recognized that a disgorgement order will often be rendered meaningless unless an asset freeze is imposed prior to the entry of final judgment.  *See SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990).  As noted by the Ninth Circuit, "the public interest in preserving the illicit proceeds [of a defendant's fraud] for restitution to the victims is great."  *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1236 (9th Cir. 1999).  Less than $100,000 remains in the 22 bank accounts used by defendants.  *See* Roscigno Decl. ¶ 4, Table 2.  Defendants took at least $9.9 million, and perhaps over $11.2 million, from investors, often using the money that was supposed to be invested in the market or to buy pre-IPO shares on

1  wasting resources such as meals, rent, and hotel stays.  An asset freeze will help to prevent

2  dissipation of any remaining assets and will also hinder efforts to conceal them where they cannot be

3  readily retrieved.

4          As to defendants, so long as the Court has jurisdiction over them, "the District Court has

5  authority to order [defendants] to 'freeze' property under [their] control, whether the property be

6  within or without the United States."  *Int'l Swiss Invs. Corp.*, 895 F.2d at 1276  (citations omitted).

7  As asset freeze is also appropriately ordered against a non-defendant, such as a relief defendant,

8  where the SEC shows that the person "(1) has received ill-gotten funds; and (2) does not have a

9  legitimate claim to those funds." *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998).  JSG

10  Management Group LLC maintained a bank account from November 4, 2015 to May 5, 2016, during

11  which time it received $297,273 in deposits.  *See* Roscigno Decl. ¶ 34.  The deposits came from three

12  sources: 1) $191,593 in cash deposits; 2) $105,650 in transfers from a JSG Capital Investments' bank

13  account; and 3) $30 for a credit against bank fees.  *Id.*  There is nothing indicating this entity has a

14  legitimate claim to the funds that were deposited into its account.

15          **2.      An Order Prohibiting the Destruction of Documents,
                       Granting Expedited Discovery and Requiring an
16                     Accounting Are Necessary**

17          The Court's broad equitable powers in SEC enforcement actions include the ability to order

18  ancillary relief to require an accounting and prohibit document destruction.  *See Wencke*, 622 F.2d at

19  1369.  Here, the SEC asks the Court to enter an order prohibiting the destruction of documents to

20  prevent defendants from destroying any evidence of their violations and ongoing fraud.

21  The Court should also allow the SEC to obtain discovery on an expedited basis.  Expedited discovery

22  is authorized by Rules 30 and 34 of the Federal Rules of Civil Procedure and a court's broad

23  equitable powers in SEC enforcement actions to order all necessary ancillary relief.  *See id*.  The

24  Court should also require an accounting by defendants so the SEC can identify all available assets to

25  help ensure that funds and assets are frozen properly and available to satisfy any future order of

26  disgorgement or civil penalties against the defendants.  *See Int'l Swiss Invs. Corp.*, 895 F.2d at 1276.

27

28

**IV.    CONCLUSION**

For the reasons set forth above, the Court should grant the Commission's *ex parte* Motion for a Temporary Restraining Order and enter the requested relief.

Dated: May 25, 2016                              Respectfully submitted,


                                                 /s/ *Jason M. Habermeyer*
                                                 JASON M. HABERMEYER
                                                 ANDREW J. HEFTY
                                                 RUTH L. HAWLEY
                                                 Attorneys for Plaintiff
                                                 SECURITIES AND EXCHANGE COMMISSION