1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   SECURITIES AND EXCHANGE            Case No.  16-cv-02814-JSW   (JCS)
    COMMISSION,

8                    Plaintiff,
                                       REPORT AND RECOMMENDATIONS
9          v.                          REGARDING MOTION FOR DEFAULT
                                       JUDGMENT
10  JSG CAPITAL INVESTMENTS, LLC, et
    al.,                               Re: Dkt. No. 52

11                   Defendants.

12

13  I.    INTRODUCTION

14         The Securities and Exchange Commission (the "SEC") moves for default judgment against

15  Defendants Jaswant (also known as Jason) Gill and Javiar Rios, as well as JSG Capital

16  Investments, LLC ("JSG Investments"); JSG Capital, LLC; JSG Capital LLC;[1] and JSG

17  Enterprises LLC (collectively, the "JSG Entities").  JSG Management Group LLC ("JSG

18  Management") is named as a relief defendant.[2]  The Court, the Honorable Jeffrey White presiding,

19  referred the SEC's motion to the undersigned magistrate judge for a report and recommendation.

20  The undersigned held a hearing on March 31, 2017, and the SEC thereafter submitted a

21  supplemental brief and declaration, and an amended proposed judgment.  For the reasons

22  discussed below, the undersigned recommends that the motion be GRANTED as modified by the

23  SEC's supplemental submissions and discussed herein, and that judgment be entered consistent

24  with this report.

25         Any party may file objections to the recommendations stated herein no later than fourteen

26  _____

27  [1] The only difference between the names of JSG Capital, LLC and JSG Capital LLC is the use of a
    comma in the former but not the latter.  *See* Compl. (dkt. 1) ¶¶ 15−16.
28  [2] The term "Defendants," as used in this report, does not include JSG Management, but instead
    denotes Gill, Rios, and the JSG Entities as defined in the previous sentence.

United States District Court
Northern District of California

United States District Court
Northern District of California

days after being served with a copy of this report. The undersigned further recommends that the Court require the SEC to serve a copy of this report on all Defendants and JSG Management by any means reasonably calculated to give actual notice, and to file proof of service to that effect, in order to allow Defendants a final opportunity to respond.

## II.   BACKGROUND

### A.   Allegations and Evidence

Gill, who has used multiple birthdates and social security numbers, is the founder and CEO of JSG Investments; JSG Capital, LLC; and JSG Capital LLC; as well as the CEO of JSG Enterprises LLC. Compl. (dkt. 1) ¶¶ 12, 17. Gill had control over the bank accounts of JSG Capital, LLC and JSG Capital LLC before those accounts were closed. *Id.* ¶¶ 15−16. Rios, who has a professional background in food service, has worked with Gill since September of 2014 and is the only member of JSG Investments. *Id.* ¶ 13. Rios is the manager of JSG Management and controls its bank accounts. *Id.* ¶ 18.

Each of the JSG Entities, as well as JSG Management, is a California limited liability company. *Id.* ¶¶ 14−17. JSG Investments was formed in 2014, "uses an unverifiable street address" in San Francisco as its purported principal place of business, and also claims to have offices in Beverly Hills and New York City. *Id.* ¶ 14. JSG Capital, LLC, formed in 2010 and currently suspended by the California Franchise Tax Board, uses the same San Francisco address as JSG Investments. *Id.* ¶ 15. JSG Capital LLC was formed in 2015 and uses the same Beverly Hills address listed by JSG Investments. *Id.* ¶ 16. JSG Enterprises LLC was formed in 2010, uses Gill's home address, and is also currently suspended by the Franchise Tax Board. *Id.* ¶ 17. JSG Management, the relief defendant, was formed in 2015 and uses the Beverly Hills address listed by JSG Investments. *Id.* ¶ 18. JSG Management "maintains a bank account into which proceeds raised from defrauded investors are transferred from other JSG Entity accounts." *Id.*

Gill and Rios raised approximately ten million dollars from nearly two hundred investors since September of 2013. *Id.* ¶ 2. One of the two investment products they marketed through JSG Investments was the "so-called 'Pre-IPO' program," governed by a "Promissory Conversion Investment Note Agreement," which purported to allocate to investors shares in specific

2

companies that had not yet made an initial public offering, and which "promised investors a guaranteed fixed interest payment of up to 60 percent annually, until the company complete[d] its IPO and the lockup period expire[d]." *Id.* ¶ 21.  JSG Investments represented to investors that they would receive the shares, or proceeds of the sale of shares, after the expiration of the lockup period, and that investors retained the right to repayment of the initial investments if an IPO did not occur within a specified period. *Id.*  The second product, defined by a "Fixed Index Investment Agreement," purported to use a proprietary trading model to invest in publicly traded stocks, and once again guaranteed a "fixed interest payment of up to 60 percent annually, with the rate of return dependent upon the amount and length of investment," as well as "repayment of the investor's initial investment in full at the end of the one-year contract term." *Id.* ¶ 22.  Gill signed contracts memorializing the terms of both purported investment products. *Id.* ¶¶ 21−22.

"Gill and his team of operatives" treated the JSG Entities interchangeably, often making interest payments from a different entity's account than the one in which the investor's initial investment was deposited. *Id.* ¶ 23.  Rios was authorized to conduct JSG Investments' and JSG Management's banking and financial transactions, and personally deposited checks from investors, wrote checks for "interest payments" to investors, and wrote checks to his own accounts. *Id.* ¶ 24.

Gill and Rios "falsely portray[ed] JSG [Investments] as an authentic and prosperous investment firm" by, for example, claiming that investors' money is invested in the stock market when in fact only a small percentage of the funds were transferred to brokerage accounts, claiming that Gill was a managing director at Morgan Stanley when in fact he never worked there, claiming security based on assets at a brokerage firm at which they in fact had no account, claiming that investors are protected by an insurance policy that does not in fact exist, and claiming a relationship with certain Silicon Valley venture capital firms with which they in fact had no relationship. *Id.* ¶¶ 3−4.  JSG Investments' website featured purported testimonials from satisfied investors touting its reliability and high rate of return. *Id.* ¶¶ 26−28.  The SEC classifies Defendants' misrepresentations into three categories: misrepresentations regarding the nature of the investments, *id.* ¶¶ 31−47, misrepresentations regarding Gill's background and qualifications, *id.* ¶¶ 48−53, and misrepresentations regarding the security of the investments, such as distributing

a falsified brokerage statement that showed a balance of $32 million for an account that in fact never exceeded $5,000, *id.* ¶¶ 54−63.  According to the SEC, Defendants were engaged in a Ponzi scheme, using new investments to pay "interest" to older investors while siphoning significant funds to Gill, Rios, and their associates.  *Id.* ¶ 64.

Gill has personally received nearly $800,000 and Rios has received approximately $1.7 million as part of the scheme, and the two of them spent an additional $500,000 of investors' money for their own purposes including travel, dining, and entertainment.  *Id.* ¶¶ 5, 42−43.[3]  All told, the JSG Entities distributed more than six million dollars for the benefit of "insiders" including Gill and Rios, including, e.g., payments for personal rent expenses, a DUI attorney, and online gambling and dating.  Roscigno Decl. (dkt. 9) ¶¶ 4, 9−11 & tbls. 2, 3.  Defendants also paid "approximately $4.2 million in Ponzi-like payments to JSG investors."  Compl. ¶ 5; *see* Roscigno Decl. tbl. 2.

The SEC brings four claims: first, violation of section 10(b) of the Exchange Act and Rule 10b-5 by all Defendants, *id.* ¶¶ 65−67; second, violation of section 17(a) of the Securities Act by all Defendants, *id.* ¶¶ 68−70; third, violation of section 206 subparts (1) and (2) of the Advisors Act by Gill and JSG Investments, *id.* ¶¶ 71−73; and fourth, that JSG Management received funds obtained through violation of the federal securities laws and lacks a legitimate claim to those funds, *id.* ¶¶ 74−77.  The SEC's complaint seeks injunctive relief, disgorgement, and civil penalties.  *Id.* ¶¶ I−IX (prayer for relief).

### B.   Procedural History

On May 27, 2016, two days after the SEC filed its complaint, the Court granted the SEC's request for a temporary restraining order barring Defendants from violating the securities laws or participating in any sale of securities or similar transaction, freezing certain accounts, and requiring Defendants to produce an accounting.  Order Granting in Part Temporary Restraining Order ("TRO Order," dkt. 24).  The Court also ordered Defendants to show cause why a

---

[3] Paragraph 5 of the complaint indicates that Gill personally received more than one million dollars of investors' money.  This report uses the more conservative figure stated in paragraph 43, but the discrepancy does not alter the recommended outcome.

United States District Court
Northern District of California

United States District Court
Northern District of California

preliminary injunction should not issue. *See id.* Defendants did not respond, and the Court issued a preliminary injunction with substantially identical terms on June 10, 2016. Order Granting Preliminary Injunction ("PI Order," dkt. 34).

The Court held a case management conference on August 26, 2016, at which Defendants did not appear. Civil Minute Order (dkt. 43). Shortly thereafter, the Court issued a scheduling order (dkt. 44) and an order advising Defendants that default judgment might be entered if they did not appear, and that the JSG Entities must appear through qualified counsel (dkt. 45). The SEC moved for entry of default against the JSG Entities on October 20, 2016, and the Clerk entered the JSG Entities' default on October 27, 2016. *See* dkts. 47, 49. On February 9, 2017, the SEC moved for entry of default against Gill and Rios; the Clerk entered their default the following day. *See* dkts. 50, 51. The SEC filed its present motion (dkt. 53) after default was entered against all Defendants, and the Court referred the matter to the undersigned magistrate judge for a report and recommendation. *See* dkt. 52.

After the undersigned held a hearing, the SEC submitted the following documents: (1) a supplemental brief arguing that disgorgement from JSG Management and the proposed injunctive relief, as modified to allow Defendants to trade securities on their own account, are appropriate, Supp'l Br. (dkt. 57); (2) a declaration by SEC staff attorney Ruth Hawley attaching a Bank of America balance letter regarding JSG Management's account, Hawley Decl. (dkt. 58); and (3) an amended proposed judgment, Am. Proposed J. (dkt. 57-1).

Judge White is also presiding over a related criminal case against Gill and Rios in this Court, in which Gill and Rios face wire fraud charges. *See United States v. Rios*, No. 4:16-cr-00219-JSW (N.D. Cal.). Gill and Rios entered pleas of not guilty in that case, and discovery is ongoing, although Gill has indicated his intent to change his plea.

### III.    ANALYSIS

#### A.    Preliminary Considerations

When entry of judgment is sought against a party who has failed to plead or otherwise defend, a district court has the affirmative duty to determine whether it has jurisdiction, *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999), as well as whether the defendants have been adequately served,

*Bank of the West v. RMA Lumber Inc.*, No. 07-6469 JSW, 2008 WL 2474650, at *2 (N.D. Cal. June 17, 2008).

The Court previously found jurisdiction to be proper in issuing the temporary restraining order and preliminary injunction. *See* TRO Order at 1; PI Order at 1. The undersigned finds no basis to alter that conclusion. With respect to subject matter jurisdiction, this action arises under the laws of the United States and thus falls within 28 U.S.C. § 1331's grant of jurisdiction. With respect to personal jurisdiction, Gill and Rios reside in California and the JSG Entities and JSG Management are all California limited liability companies. Compl. ¶¶ 12−18. All Defendants are therefore subject to the jurisdiction of this Court.

As for service of process, the SEC filed evidence in support of its application for entry of default demonstrating that process servers served the registered agent or managing agent of each of the JSG Entities on May 26th, 2016, and personally served Gill and Rios on May 31st, 2016 and June 1, 2016, respectively. *See* Supplement to Request for Entry of Default & Hefty Aff. (dkt. 48); Request for Entry of Default & Hawley Decl. (dkt. 50). The undersigned finds this showing to be sufficient.

### B.   Legal Standard for Entry of Default Judgment

After default has been entered against a party, a district court may grant an application for default judgment in its discretion. *See* Fed. R. Civ. P. 55(b)(2). If the court is satisfied that jurisdiction is proper and that service of process upon the defendant was adequate, it then considers several factors in determining whether to grant default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471−72 (9th Cir. 1986). In making its decision, the court takes all factual allegations in the complaint, except those relating to damages, as true. *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917−18 (9th Cir. 1987) (citing *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977)); *see also* Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one

6

1  relating to the amount of damages—is admitted if a responsive pleading is required and the

2  allegation is not denied.").

3  **C.   *Eitel* Factors**

4  Several of the *Eitel* factors weigh in favor of granting default judgment simply by virtue of

5  the fact that Defendants not participated in this action.  Because Defendants have failed to respond

6  to the complaint or otherwise appear in this action, the SEC will be left without a remedy, and

7  therefore prejudiced, if default judgment is not granted.  The sum of money at stake, while

8  significant, is justified by the evidence submitted by the SEC establishing misappropriation of

9  investors' funds, as discussed further below.  Defendants were properly served, and there is no

10  indication that their default is due to excusable neglect.  Defendants could conceivably dispute

11  some of the material facts if they were to appear, but they have failed to do so.  Finally, while

12  there is a strong public policy favoring the resolution of disputes on the merits, that is not possible

13  in this case because Defendants have failed to appear and there is no indication that they intend to

14  do so.

15  The remaining factors, "the merits of plaintiff's substantive claim" and "the sufficiency of

16  the complaint," are intertwined where, as here, the case has not advanced beyond the pleading

17  stage.  As detailed below, the undersigned finds that these factors also favor granting default

18  judgment as to each of the SEC's claims.

19  **1.   Claim Under Section 10(b) and Rule 10b-5**

20  Under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), it is

21  unlawful to use "any means or instrumentality of interstate commerce or of the mails . . . [t]o use

22  or employ, in connection with the purchase or sale of any security . . . any manipulative or

23  deceptive device or contrivance in contravention of such rules and regulations as the Commission

24  may prescribe."  15 U.S.C. § 78j(b).  Rule 10b-5 broadly prohibits the use of (a) "any device,

25  scheme, or artifice to defraud"; (b) "any untrue statement of a material fact" or misleading

26  omission of a material fact; or (c) "any act practice, or course of business which operates or would

27  operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5.  "Liability under Section

28  10(b) and Rule 10b-5 therefore requires evidence of (1) a material misrepresentation, (2) in

United States District Court
Northern District of California

7

connection with the purchase or sale of a security, (3) with scienter, (4) by means of interstate commerce." *SEC v. Todd*, 642 F.3d 1207, 1215 (9th Cir. 2011) (citing *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855−56 (9th Cir. 2001)).  To be liable for a fraudulent scheme under Rule 10b-5 paragraphs (a) or (c), the scheme must "encompass[] conduct beyond . . . misrepresentations or omissions." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011).

Taking the allegations of the Complaint as true, *see TeleVideo Sys.*, 826 F.2d at 917−18, Defendants' conduct here meets each of the four elements set forth in *Todd*.

As for the first element, Defendants made numerous material misrepresentations to investors, including that certain funds would be invested in pre-IPO shares of specific companies (which was false), Compl. ¶¶ 21, 33, 39, that certain funds would be invested in publicly traded stocks (which was only true as to a small percentage of those funds), *id.* ¶¶ 22, 33, 39, that Gill had been a managing director at Morgan Stanley and had relationships with Silicon Valley venture capital firms (which was false), *id.* ¶¶ 48−52, and that investments with the JSG Entities were secured by assets and an insurance policy (which was false), *id.* ¶¶ 54−63.  Defendants' fraudulent conduct also extended beyond misrepresentations or omissions, and thus meets the "fraudulent scheme" standard of paragraphs (a) and (c), because they took concrete steps including receiving investments, using investors' money for Gill's and Rios's personal benefit, and passing off new investors' money as purported interest on earlier investors' investments.  *See id.* ¶¶ 38, 40−43, 46, 47.

For the second element, whether Defendants' misrepresentations were "in connection with the purchase or sale of a security," *see Todd*, 642 F.3d at 1215, a small portion of the investors' money was in fact used to buy publicly traded securities.  *See* Compl. ¶ 39.  Moreover, even if that were not so, the Supreme Court has endorsed the SEC's position that "a broker who accepts payment for securities that he never intends to deliver, or who sells securities with intent to misappropriate the proceeds, violates § 10(b) and Rule 10(b)-5." *SEC v. Zandford*, 535 U.S. 813, 814 (2002).  Defendants consistently represented to investors that their funds would be used to purchase securities and accepted payment based on those representations.  *See* Compl. ¶¶ 31−35,

United States District Court
Northern District of California

1    38.

2         The third element, scienter, can be met by showing either "'intent to deceive, manipulate,

3    or defraud,'" *Todd*, 642 F.3d at 1215 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193

4    n.12 (1976)), or "[r]eckless conduct"—i.e., "a highly unreasonable act or omission that is an

5    'extreme departure from the standards of ordinary care, and which presents a danger of misleading

6    buyers or sellers that is either known to the defendant or is so obvious that the actor must have

7    been aware of it,'" *id.* (quoting *Dain Rauscher*, 254 F.3d at 856).  Here, the SEC specifically

8    alleges, and the undersigned takes as true in this context, that Gill and Rios knew or were reckless

9    in not knowing that their representations to investors were false.  Compl. ¶¶ 46−47.  Moreover, the

10   alleged course of conduct—including using the vast majority of funds received either for insiders'

11   personal benefit or as Ponzi-like payments to earlier investors, as well as the unfounded

12   representations regarding Gill's background, the balance of the JSG Entities' accounts, and the

13   existence of an insurance policy—strongly supports an inference of scienter.  *See SEC v. Smart*,

14   678 F.3d 850, 857 (10th Cir. 2012) (holding that where a defendant did not use investors' funds in

15   the manner that he said he would, used some funds for his own personal expenses, "ignored

16   investors' inquiries about the status of their funds[,] and provided false accountings," the

17   "circumstances go beyond mere recklessness and indicate a deliberate intent to defraud

18   investors").

19        The final element requires that the fraudulent scheme occur "by means of interstate

20   commerce."  *Todd*, 642 F.3d at 1215.  The complaint alleges that Defendants utilized a website,

21   Compl. ¶¶ 25−28, 31−32, 49−50, and communication by email and telephone, *e.g.*, *id.* ¶¶ 29,

22   34−35, 51, to solicit funds from investors "who are scattered throughout the country," *id.* ¶ 25.

23   The undersigned is therefore satisfied that the fraudulent scheme here involved "means or

24   instrumentalit[ies] of interstate commerce, or of the mails."  *See* 15 U.S.C. § 78j; 17 C.F.R.

25   § 240.10b-5; *see also, e.g.*, *United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007) (holding

26   that the internet is "an instrumentality and channel of interstate commerce" (citation omitted)).

27        Because each of the *Todd* elements is satisfied, the complaint is sufficient to state a claim

28   for violation of Section 10(b) and Rule 10b-5.  Taking the allegations of the complaint as true,

United States District Court
Northern District of California

both the "the merits of plaintiff's substantive claim" and "the sufficiency of the complaint" favor

granting default judgment on this claim.  *See Eitel*, 782 F.2d at 1471−72.

### 2.  Claims Under Section 17(a)

Section 17(a) of the Securities Act of 1933 reads as follows:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).  Paragraph (1) if Section 17(a) requires scienter, but paragraphs (2) and (3) do

not.  *Aaron v. SEC*, 446 U.S. 680, 701−02 (1980).

For substantially the same reasons discussed above in the context of Section 10(b) and

Rule 10b-5, the undersigned finds that the SEC's complaint states a claim for violation of

paragraphs (1) and (3) of Section 17(a).  *See SEC v. Phan*, 500 F.3d 895, 907−08 (9th Cir. 2007)

(analyzing section 17(a), section 10(b), and Rule 10b-5 together).  Taking the SEC's allegations as

true, Defendants used means or instruments of interstate commerce in the sale of securities to

employ a "scheme . . . to defraud" and engage in a "transaction, practice, or course of business

which operate[d] . . . as a fraud or deceit upon the purchaser[s]."  *See* 15 U.S.C. § 77q.  With

respect to the scienter requirement of paragraph (1), the undersigned finds the allegations

sufficient to show that Defendants acted with intent to defraud.

As compared to Section 10(b) and Rule 10b-5(b), Section 17(a)(2) adds the requirement

that the defendant "obtain money or property" by means of his material misrepresentation.  15

U.S.C. § 77q(a)(2).  The SEC adequately alleges, and the undersigned takes as true, that

Defendants' misrepresentations resulted in investors' money being deposited into accounts owned

by the various JSG Entities and that Gill and Rios ultimately received substantial funds for their

United States District Court
Northern District of California

United States District Court
Northern District of California

own personal benefit.  *See* Compl. ¶¶ 38, 41−43.

The undersigned finds that the SEC's complaint adequately states a claim under each paragraph of Section 17(a), and that the "the merits of plaintiff's substantive claim" and "the sufficiency of the complaint" therefore favor granting default judgment on this claim.  *See Eitel*, 782 F.2d at 1471−72.

### 3.   Claim Under Section 206

Section 206 of the Advisers Act provides in relevant part that it is "unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—"

> (1) to employ any device, scheme, or artifice to defraud any client or prospective client; [or]

> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client[.]

15 U.S.C. § 80-b(6).  Violation of this statute is established "by essentially the same conduct" as discussed above in the context of section 10(b) and section 17(a), *see Vernazza v. SEC*, 327 F.3d 851, 858 (9th Cir. 2003), with the additional requirement that the defendant must be an "investment adviser," *see* 15 U.S.C. § 80-b(6).  That term is defined as follows, subject to a number of enumerated exceptions not relevant here:

> any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities . . . .

15 U.S.C. § 80b-2(11).

The SEC brings this claim only against Gill and JSG Investments, arguing that they acted as investment advisers by touting the profitability of the securities they offered to investors, by describing JSG Investments as an "Investment Advisory firm" in marketing materials, and by making investment decisions and engaging in trading.  Mot. at 9−10 (citing Compl. ¶¶ 20, 31−32, 36, 39−43).  Persons who manage funds on behalf of others are generally considered to be "investment advisers" within the meaning of the securities laws.  *See, e.g.*, *SEC v. Trabulse*, 526

1   F. Supp. 2d 1008, 1014 (N.D. Cal. 2007) (citing *Abrahamson v. Fleschner,* 568 F.2d 862, 870 (2d

2   Cir. 1977)).  As for the requirement that an investment adviser receive "compensation," courts

3   have held that misappropriating or comingling investor funds for personal use satisfies the statute.

4   *E.g.*, *United States v. Elliott*, 62 F.3d 1304, 1306 & n.1, 1310 (11th Cir. 1995).  Based on the

5   allegations that JSG Investments received funds from investors that were not actually invested in

6   the securities advertised, *see* Compl. ¶ 38, and that "Gill wrongfully obtained nearly $800,000 in

7   cash or other benefits," *id.* ¶ 43, the undersigned is satisfied that both Gill and JSG Investments

8   meet the definition of "investment advisers" within the meaning of section 206.

9       Accordingly, because the conduct detailed above in the context of the SEC's other claims

10  also constitutes a violation of this statute, the undersigned finds that the complaint adequately

11  states a claim under section 206, and that the "the merits of plaintiff's substantive claim" and "the

12  sufficiency of the complaint" therefore favor granting default judgment on this claim.  *See Eitel*,

13  782 F.2d at 1471−72.

### 4.  Claim Against JSG Management

15      The SEC also brings a claim against JSG Management as a "relief defendant," seeking to

16  recover funds that JSG Management received as a result of Defendants' fraudulent conduct.  The

17  Ninth Circuit addressed claims against relief defendants, also known as "nominal defendants," in

18  the context of securities enforcement actions in *SEC v. Colello*:

> A nominal defendant is a person who "holds the subject matter of the litigation in a subordinate or possessory capacity as to which there is no dispute." [*SEC v. Cherif,* 933 F.2d 403, 414 (7th Cir. 1991)] (internal quotations and citation omitted). The paradigmatic nominal defendant is "a trustee, agent, or depositary . . . [who is] joined purely as a means of facilitating collection." *Id.* (internal quotations and citation omitted). As the nominal defendant has no legitimate claim to the disputed property, he is not a real party in interest. *Id.* Accordingly, "there is no claim against him and it is unnecessary to obtain subject matter jurisdiction over him once jurisdiction of the defendant is established." *Id.*
>
> [. . .]
>
> [A]mple authority supports the proposition that the broad equitable powers of the federal courts can be employed to recover ill gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong. For example, the Supreme Court has held that a

United States District Court
Northern District of California

12

United States District Court
Northern District of California

plaintiff who has a cause of action under the securities laws can enforce those rights "by such legal or equitable actions or procedures as would normally be available to him." *Deckert v. Independence Shares Corp.,* 311 U.S. 282, 287–88, 61 S. Ct. 229, 232–33, 85 L. Ed. 189 (1940). This court has declared that "federal courts have inherent equitable authority to issue a variety of 'ancillary relief' measures in actions brought by the SEC to enforce the federal securities laws." *SEC v. Wencke,* 622 F.2d 1363, 1369 (9th Cir.1980) ("*Wencke II* "). This broad power extends over third parties to the action. *Wencke II,* 622 F.2d at 1369 (District court has power to enjoin non-parties from suing a receivership in securities' action.).

The Supreme Court's hostility to causes of action without textual support and precedent supporting broad equitable powers can be reconciled by distinguishing between causes of action and forms of relief, a distinction drawn by the Supreme Court. . . . Accordingly, we conclude that the SEC may name a non-party depository as a nominal defendant to effect full relief in the marshalling of assets that are the fruit of the underlying fraud.

[. . .]

[W]e emphasize that in the typical case, the creditor plaintiff must show that the nominal defendant has received ill gotten funds *and* that he does not have a legitimate claim to those funds.

*SEC v. Colello,* 139 F.3d 674, 676–77 (9th Cir. 1998) (some alterations in original) (footnotes omitted).

Although JSG Management does not appear to stand precisely in the role of a "standard nominal defendant" such as "a bank or trustee, which has only a custodial claim to the property," *see id.*, the SEC alleges that JSG Management received funds as a result of Defendants' unlawful fraudulent conduct, "may continue to hold" such funds, and "does not have a legitimate claim to the funds obtained," Compl. ¶¶ 75−77. John Roscigno, an SEC accountant, states in his declaration (which was submitted at the outset of this case in support of the SEC's motion for a temporary restraining order) that JSG Management "received $297,273 in deposits," consisting of "1) $191,593 in cash deposits, 2) $105,650 in transfers from [an account affiliated with JSG Investments] and 3) $30 for a credit against bank fees." Roscigno Decl. (dkt. 9) ¶ 34. The SEC submits a bank statement with its supplemental materials indicating that JSG Management's account at Bank of America currently holds $42,438.84. Hawley Decl. Ex. A. Because JSG Management received ill-gotten funds to which it had no legitimate claim, the SEC properly states a claim against JSG Management as a relief defendant and is entitled to default judgment.

**D.     Relief Requested**

**1.  Permanent Injunctions**

Both the Securities Act and the Exchange Act grant the Court discretion to enjoin practices that violate those acts where there is a reasonable likelihood of future violations.  15 U.S.C. §§ 77t(b), 78(u)d; *see also SEC v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996).  In determining whether there is a likelihood of future violations, courts consider the following factors:

> (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; (5) and the sincerity of his assurances against future violations.

*Fehn*, 97 F.3d at 1295.

Here, each factor favors granting an injunction.  First, as discussed above, the undersigned finds that Defendants acted with intent to defraud.  Second, although the allegations reflect one fraudulent scheme, the misconduct at issue is more properly characterized as "recurrent" than "isolated": Defendants' scheme extended over a period of years, *see* Compl. ¶ 2, and they engaged in numerous acts of deception to perpetrate the fraud.  Third, there is no evidence that Defendants have shown recognition of wrongful conduct.  Fourth, Defendants solicited investments for a period of years, placing them in an occupation with a high risk of future violations.  Finally, there is no indication that Defendants have made any assurance against future violations.  The undersigned therefore recommends that the Court GRANT the SEC's proposed injunction against future violations, as stated in sections I through III of the proposed judgment (dkt. 52-1).

The SEC also seeks injunctive relief barring Defendants from participating in transactions related to securities.  *See* Proposed Judgment §§ IV, V.  Specifically, the SEC would have the Court prohibit Defendants from "directly or indirectly participating in in the issuance, purchase, offer, or sale of any security of or through any entity controlled by, or under joint control with, any of them," *id.* § IV, and "from directly or indirectly soliciting any person or entity to purchase or sell any security [or] recommending or advising any person or entity with respect to investing in any security," *id.* § V.  After the undersigned raised concerns at the hearing regarding the breadth

14

of the proposed injunction, the SEC modified their request to clarify that the proposed injunction "shall not prevent Defendants Gill or Rios from purchasing or selling securities through their own personal accounts, or accounts owned for their or their immediate families' personal benefit, such as a family trust account, provided that that the accounts are in no way funded by investors' money."  Amended Proposed Judgment § IV; *see also id.* § V (including a similar caveat).

According to the SEC, such an injunction is permissible because where "the underlying statute does not limit the scope of injunctions that may be issued, the court retains its broad equitable powers to fashion appropriate relief."  Supp'l Br. at 1 (citing *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) (relying on a provision of the Emergency Price Control Act "expressly authoriz[ing] the District Court, upon a proper showing, to grant 'a permanent or temporary injunction, restraining order, *or other order*'" (emphasis added)); *United States v. Universal Mgmt. Servs., Inc.*, 191 F.3d 750, 761–62 (6th Cir. 1999) (holding that the Food, Drug, and Cosmetic Act's grant of jurisdiction "to restrain violations of . . . this title" impliedly authorizes equitable relief of restitution)).   The explicit terms of the statutory authorizations for injunctive relief on which the SEC relies only go so far as to permit, where a person "is engaged or about to engage in any acts or practices which constitute or will constitute a violation" an injunction against "such acts or practices"—i.e., an injunction against future violations of the securities laws.  *See* 15 U.S.C. §§ 77t(b), 78u(d)(1).[4]  None of the cases cited in the SEC's initial motion address a broad injunction against participating in transactions related to securities, without limitation to transactions that violate the securities laws.  *See Fehn*, 97 F.3d at 1282 (addressing "an order permanently enjoining Fehn from future aiding and abetting violations of the securities laws"); *SEC v. Randolph*, 736 F.2d 525, 527 (9th Cir. 1984) (addressing a consent decree regarding "entry of permanent injunctions against future violations of the securities laws"); *SEC v. Murphy*, 626 F.2d 633, 639 (9th Cir. 1980) (addressing a judgment that "enjoined Murphy from future violations, and directed that he send copies of the court's order to" various parties affected by his conduct).  In its supplemental brief, however, the SEC identifies several cases

---

[4] 15 U.S.C. § 78u(d)(2) also authorizes orders barring certain persons from serving as officers or directors of certain entities, but such relief is not at issue in the present action.

United States District Court
Northern District of California

where courts enjoined more than merely future violations, albeit often not so broadly as what the SEC seeks here.  *See SEC v. eAdGear, Inc.*, No. 3:14-CV-04294-RS, 2015 WL 11578507, at *3 (N.D. Cal. July 14, 2015) (enjoining defendants from "participating in the issuance, offer, or sale of any security of any entity controlled by, or under joint control with, any of them, including but not limited to securities of eAdGear"); *Trabulse*, 526 F. Supp. 2d at 1018 (prohibiting a fund manager from "withdrawing any money whatsoever from the fund without a prior accounting to the SEC and this Court"); *SEC v. Aequitas Mgmt., LLC*, No. 3:16-cv-00438-PK, 2016 U.S. Dist. LEXIS 34187, at *6 (D. Or. Mar. 15, 2016) (granting a stipulation by all parties to enjoin the defendants "from directly or indirectly participating in the issuance, offer, or sale of any security of any entity controlled by, or under joint control with, any of them").

Two cases cited in the SEC's supplemental brief involve injunctions related to the sale of *any* security, comparable to what the SEC seeks here.  *SEC v. Sethi Petroleum, LLC*, No. 4:15-CV-338, 2015 WL 4040123, at *1 (E.D. Tex. July 1, 2015) (quoting a previously issued injunction barring a defendant "'from directly or indirectly . . . participating in the issuance, purchase, offer, or sale of any security, [except for] purchasing or selling securities listed on a national securities exchange for his own personal accounts" (ellipsis in original)); *SEC v. Mattera*, No. 11 Civ. 8323 (PKC), 2013 WL 6485949, at *18 (S.D.N.Y. Dec. 9, 2013) (permanently enjoining a defendant "from, directly or indirectly, participating in the issuance, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities listed on a national securities exchange for his own personal account").

The SEC's request for broad injunctive relief presents two questions: whether such relief is falls within the Court's authority under the statutes on which the SEC relies, and, if so, whether the scope of the proposed injunction is warranted by the facts of this case.  With respect to the Court's authority, it is not obvious that this is a case where, as the SEC contends, "the underlying statute does not limit the scope of injunctions that may be issued."  *See* Supp'l Br. at 1.  By their terms, the underlying statutes authorize actions to enjoin "acts or practices which constitute or will constitute a violation" of the securities laws.  15 U.S.C. §§ 77t(b), 78u(d)(1).  Soliciting or giving advice regarding investments in securities is not, in itself, necessarily a violation of the securities

United States District Court
Northern District of California

1  laws.  The Supreme Court has held, however, that "[w]hen Congress entrusts to an equity court the

2  enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted

3  cognizant of the historic power of equity to provide complete relief in the light of statutory

4  purposes." *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291–92 (1960); *see also*

5  *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552 (9th Cir. 1992) (citing *Mitchell*).  "The

6  basic purpose and intent of Congress in enacting the Securities Act of 1933 was to protect

7  innocent purchasers of securities . . . ." *Straley v. Universal Uranium & Milling Corp.*, 289 F.2d

8  370, 372 (9th Cir. 1961).  In light of the Supreme Court's construction of statutory grants of

9  equitable authority in *Mitchell*, the purpose of the laws at issue, and the relatively common

10  practice of district courts enjoining conduct that does not necessarily and inherently violate the

11  securities laws, the undersigned is satisfied that the Court has the authority to issue such an

12  injunction upon finding that the terms of the injunction are necessary to protect innocent investors.

13  The next question is whether the injunction proposed by the SEC—barring Defendants

14  from participating in transactions regarding securities "of or through any entity controlled by . . .

15  them," Amended Proposed Judgment § IV, and from soliciting or advising transactions regarding

16  any security whatsoever, *id.* § V, with exceptions for their own personal investment activities—is

17  appropriate on the facts of this case.  As cited by the SEC, a number of courts have entered

18  comparable injunctions against similarly situated defendants.  *E.g.*, *eAdGear*, 2015 WL 11578507,

19  at *3; *Sethi Petroleum, LLC*, 2015 WL 4040123, at *1.  Given the nature of the alleged scam in

20  this case, taken as true for the purpose of the present motion, the undersigned finds that the

21  proposed injunction is warranted and recommends that the injunctive relief requested in the

22  amended proposed judgment be GRANTED.

23  ### 2.  Disgorgement from Liability Defendants

24  "The district court has broad equity powers to order the disgorgement of 'ill-gotten gains'

25  obtained through the violation of the securities laws.  Disgorgement is designed to deprive a

26  wrongdoer of unjust enrichment, and to deter others from violating securities laws by making

27  violations unprofitable." *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998)

28  (citations omitted).  "'[W]here two or more individuals or entities collaborate or have a close

17

relationship in engaging in the violations of the securities laws, they [may be] held jointly and severally liable for the disgorgement of illegally obtained proceeds.'" *JT Wallenbrock*, 440 F.3d at 1117 (quoting *First Pac. Bancorp*, 142 F.3d at 1191) (alterations in original).  "[A]lthough it is normally within the district court's discretion to order that disgorged funds be used to compensate securities fraud victims, there is no merit in [the] contention that such an order is required." *SEC v. Fischbach Corp.*, 133 F.3d 170, 176 (2d Cir. 1997); *see also First Pac. Bancorp*, 142 F.3d at 1193 (citing *Fischbach* with approval).  "The district court [is] not required to trace every dollar of the . . . proceeds," and may properly order disgorgement of "only 'a reasonable approximation of profits causally connected to the violation.'" *First Pac. Bancorp*, 142 F.3d at 1192 n.6 (quoting *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996)).

John Roscigno's declaration, submitted with the SEC's initial request for a temporary restraining order, details the proceeds of Defendants' fraudulent scheme.  *See generally* Roscigno Decl. (dkt. 9).  According to Roscigno's summary of Defendants' financial records, Defendants received $9,986,561.12 from investors and disbursed $4,273,820.60 to investors, resulting in net proceeds of $5,712,740.52.  *Id.* ¶ 4 & tbl. 2.  These figures do not include $749,113 in cash deposits of unknown origin or $491,355.46 in other deposits of unknown origin.  *Id.*  The JSG Entities paid out a net value of $6,126,013.49—somewhat more than the net gain that can reliably be attributed to proceeds from investors—for the personal benefit of various "insiders," including Gill and Rios.  *See id.* ¶¶ 4, 9−11 & tbls. 2, 3.  On this evidence, the undersigned is satisfied that the $5,712,740.52 net proceeds from investors constitute an "'ill-gotten gain' that 'unjustly enriched' a 'wrongdoer,'" and that such proceeds are therefore a suitable basis for disgorgement.  *See JT Wallenbrock*, 440 F.3d at 1117 (quoting *First Pac. Bancorp*, 142 F.3d at 1191−93).

The SEC also seeks prejudgment interest.  Awards of prejudgment interest fall within the district court's discretion.  *See Platforms Wireless*, 617 F.3d at 1099.  In its administrative proceedings, the SEC has adopted the prejudgment interest rate set forth at 26 U.S.C. § 6621(a)(2), which by its terms governs underpayment of taxes.  *See Platforms Wireless*, 617 F.3d at 1099.  The Ninth Circuit has "conclude[d] that the SEC's reasoning on this issue is persuasive" and affirmed a district court order applying that rate to disgorgement of profit

obtained in violation of the securities laws.  *Id.*  Section 6621(a)(2) provides for an interest rate equal to "(A) the Federal short-term rate [rounded to the nearest full percentage point] . . . plus (B) 3 percentage points."  26 U.S.C. § 6621(a)(2).

The SEC's motion includes a footnote calculating interest from June of 2016—the first full month in which Defendants received no funds from investors—through the end of February of 2017.  Mot. at 12 n.7.  The undersigned finds these calculations to be generally correct[5] and recommends that disgorgement include $172,372.77 in prejudgment interest, for a total of $5,885,113.29.

### 3.   Disgorgement from Relief Defendant

As discussed above, the securities laws authorize the SEC to seek disgorgement of ill-gotten funds from a relief defendant who has no legitimate claim to the funds, without a further showing of misconduct by the relief defendant.  At the hearing, the undersigned asked the SEC to address the extent to which, if at all, the SEC must show that the relief defendant still holds the funds that the SEC seeks to disgorge.  The SEC's supplemental brief cites a recent Ninth Circuit decision squarely addressing that point.  *See* Supp'l Br. at 3 (citing *SEC v. World Capital Markets, Inc.*, __ F.3d __, No. 15-55325, 2017 WL 1055590 (9th Cir. Mar. 21, 2017)).  In light of the Ninth Circuit's holding that "ongoing possession of the funds is not required for disgorgement," the SEC need only show that JSG Management received funds to which it had no legitimate claim, not that it still retains those funds.  *See World Capital Markets*, 2017 WL 1055590, at *8 (citing *Platforms Wireless*, 617 F.3d at 1098; *JT Wallenbrock*, 440 F.3d at 1116; *Colello*, 139 F.3d at 677).  The SEC's allegations and evidence sufficiently demonstrate that JSG Management received $105,650 from an account used for Defendants' fraudulent activities.  Roscigno Decl. ¶ 34.  The undersigned recommends that the request for disgorgement of those funds be GRANTED.[6]

---

[5] The SEC's calculations appear to compound interest quarterly rather than daily.  *See* 26 U.S.C. § 6622(a) (providing that for tax underpayment, interest "shall be compounded daily").  Because any difference resulting from that discrepancy is de minimis and favors Defendants, the undersigned recommends that the Court award the SEC the $172,372.77 in prejudgment interest that it requests.

[6] The SEC does not seek disgorgement of the cash deposits and bank credits received by JSG

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 4. Civil Penalties

The SEC also asks that the Court impose civil monetary penalties on Defendants pursuant to 15 U.S.C. §§ 77t(d)(2) (under the Securities Act), 78u(d)(3) (under the Exchange Act), and 80b-9(e) (under the Advisers Act).  The purpose of imposing monetary penalties in addition to disgorgement of profits is to punish the violator as well as deter future violations of the securities laws. *SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996).  With disgorgement alone, absent any mechanism for an additional penalty, "even a violator who is caught is required merely to give back his gains with interest, leaving him no worse off financially than if he had not violated the law."  H.R. Rep. No. 101-616 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1379, 1384 (explaining the legislative intent behind the civil penalty statutes).

Congress has established a three-tiered system to guide courts in determining the appropriate amount of civil monetary penalties. *See* 15 U.S.C. §§ 77t(d)(2), 78u(d)(3).  A "first-tier" penalty of up to $7,500 for an individual and $75,000 for any other entity may be imposed for each violation of the securities laws, a "second-tier" penalty of up to $75,000 for an individual and $375,000 for any other entity may be imposed for violations of the securities laws that involve fraud or deceit, and a "third-tier" penalty of up to $150,000 for an individual and $725,000 for any other entity may be imposed for violations of the securities laws that involved fraud or deceit and resulted in substantial loss or a significant risk of substantial loss.  15 U.S.C. §§ 77t(d)(2), 78u(d)(3); 17 C.F.R. § 201.1004 & Table IV (adjusting statutory penalties for inflation).  A court may alternatively impose a penalty up to "the gross amount of pecuniary gain to [the] defendant as a result of the violation," regardless of the tier.  15 U.S.C. §§ 77t(d)(2), 78u(d)(3).  Subject to those maximum limits, the amount of the penalty is left to the discretion of the court, to be determined "in light of the facts and circumstances" of the case.  15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i).

The undersigned finds that Defendants' conduct in this case falls within the third tier.  As discussed above, Defendants defrauded numerous investors over a period of years, resulting in a

Management.  *See* Supp'l Br. at 2–4.

substantial net loss to the investors—many of whom were not wealthy and lacked investment experience, Compl. ¶ 25—totaling more than five million dollars. *See* Roscigno Decl. tbl. 4.  In light of Defendants' flagrant deception and misappropriation of funds, the undersigned recommends imposing civil penalties equal to Defendants' pecuniary gain of $5,712,740.52.[7]

## IV.   CONCLUSION

For the reasons discussed above, the undersigned recommends that the SEC's motion be GRANTED as follows: (1) that judgment be entered in favor of the SEC as to the first three claims of the complaint; (2) that a permanent injunction be imposed consistent with the SEC's amended proposed judgment; (3) that Defendants (not including JSG Management) be jointly and severally ordered to disgorge ill-gotten gain totaling $5,885,113.29, including interest; and (4) that civil penalties of $5,712,740.52 be assessed against Defendants (not including JSG Management), jointly and severally; and (5) that JSG Management be ordered to disgorge ill-gotten gain totaling $105,650.

Although not required by the Federal Rules of Civil Procedure, the undersigned further recommends that the Court instruct the SEC to serve a copy of this report on Defendants by any means reasonably calculated to provide actual notice, and to file proof of service to that effect. The undersigned recommends that the Court withhold judgment until fourteen days after service to allow Defendants a final opportunity to respond to the SEC's allegations.  Any party may file objections to the recommendations herein within fourteen days of being served with a copy of this report.

Dated: June 30, 2017

_____
JOSEPH C. SPERO
Chief Magistrate Judge

---

[7] The SEC has not addressed whether prejudgment interest on the defendant's initial gain can be included in calculating a civil penalty under the securities laws.  The Court need not resolve that issue—even if including interest would be permissible, the undersigned finds $5,712,740.52 to be a sufficient penalty to serve the statutes' punitive and deterrent purposes.